Rom Bar-Nissim (SBN 293356)
Rom@HeahBarNissim.com
HEAH BAR-NISSIM LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 432-2836

*Attorney for Plaintiffs and the Proposed Class*
[additional counsel on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TED ENTERTAINMENT, INC., MATT FISHER, and GOLFHOLICS, INC., each individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br>  v.<br><br>APPLE, INC.,<br>    Defendant | Case No.: 3:26-cv-2936<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Ted Entertainment, Inc. ("TEI"), Matt Fisher, and Golfholics, Inc. (collectively, where appropriate "Plaintiffs"), each individually and on behalf of all others similarly situated (the "Class," as defined below), by and through their undersigned counsel, file this Complaint against Apple, Inc. ("Defendant"), for violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201. The allegations contained herein, which are based on Plaintiffs' knowledge of facts pertaining to themselves and their own actions and counsels' investigations, and upon information and belief as to all other matters, are as follows:

## **NATURE OF THE ACTION**

1. This is a nationwide class action for violations of the DMCA's anti-circumvention provisions, 17 U.S.C. § 1201(a), arising from Defendant unlawfully circumventing technological protection measures to access and scrape millions of copyrighted videos from the online video viewing platform, YouTube, in order to feed, train, improve, and commercialize Defendant's large-scale generative text-to-video artificial intelligence ("AI") model (hereinafter referred to as "Apple AI Video").

2. YouTube allows the public to view audiovisual works only through controlled streaming, keeping its underlying video files locked away behind careful access restrictions.

3. YouTube does not provide public access to the underlying audiovisual works themselves, but instead delivers those works through a controlled streaming architecture that includes technological protection measures ("TPMs") which require the application of authorized processes, including tokenized requests, segmented delivery protocols, and player-based reconstruction.

4. Defendant published a peer-reviewed academic paper authored by its own researchers publicly disclosing that it trained Apple AI Video on Panda-70M—a dataset derived entirely from millions of YouTube videos that were themselves extracted from YouTube through circumvention of YouTube's TPMs.

5. Defendant deployed tools designed to evade and circumvent YouTube's TPMs by deploying automated systems that replicated and manipulated authorized request flows while evading enforcement mechanisms, thereby gaining access to the underlying works in a form not

1
CONSOLIDATED CLASS ACTION COMPLAINT

available to the public and outside the conditions authorized by the copyright owner.

6.      On information and belief, Defendant used automated video-downloading programs combined with virtual machines that rotated IP addresses to avoid detection and blocking, enabling the mass unauthorized access and extraction of videos at the scale necessary to train Apple AI Video. Defendant then used Plaintiffs' and Class Members' intellectual property for their own commercial gain in developing and commercializing Apple AI Video. In doing so, Defendant has violated the law (and YouTube's Terms of Service), which were intended to protect Plaintiffs and others similarly situated.

7.      By accessing, scraping, and downloading those files, Defendant deliberately circumvented YouTube's access controls to obtain the training data necessary to build and commercialize Apple AI Video.

8.      This case does not concern ordinary viewing or downstream copying of publicly available content. It concerns Defendant's deliberate circumvention of YouTube's controlled streaming architecture to access copyrighted works in a form and manner not made available to the public. YouTube does not provide open access to audiovisual works themselves, but instead conditions access on the application of specific technical processes that Defendant intentionally bypassed.

9.      Plaintiffs and the Class Members whom Plaintiffs seek to represent are content creators who upload their audiovisual content to YouTube. On information and belief, the audiovisual content of Class Members was among the video content utilized by Defendant to train Apple AI Video and related generative AI models.

10.      In uploading content to YouTube, content creators are authorizing and instructing YouTube to provide protection to the video content through YouTube's anti-circumvention software. In fact, YouTube's anti-circumvention software are a driving factor behind many content creators' decision to upload their video content to YouTube.

11.      Rather than seek permission or pay a fair price for the audiovisual content hosted on YouTube, Defendant harvested content creators' protected and copyrighted videos for commercial use and at scale without consent or compensation to the content creators.

CONSOLIDATED CLASS ACTION COMPLAINT

12.     Defendant's actions were not only unlawful, but an unconscionable attack on the community of content creators whose content is used to fuel the multi-trillion-dollar generative AI industry without any compensation.

13.     Content creators such as Plaintiffs and the Class Members will never be able to claw back the intellectual property unlawfully copied and used by Defendant to train its generative AI models. Once AI ingests content, that content is stored in its neural network and not capable of deletion or retraction. Defendant's actions constitute abuse and exploitation of content creators' work for Defendant's profit.

14.     Most YouTube videos are not registered with the U.S. Copyright Office. That lack of registration, however, does not render them valueless or leave them unprotected. Content creators invest time, skill, and resources into producing their works, and they rely on YouTube's TPMs to safeguard their files from unauthorized access. Because copyright registration is not a prerequisite for protection against unlawful circumvention of access controls, this claim is especially critical where Defendant's misconduct lies in breaking through access barriers that prevent anyone from obtaining the underlying files in the first place.

15.     It is also critical to protect a flourishing internet ecosystem. In a world where Defendant and others can circumvent technological protections to exploit copyrighted works without authorization with impunity, creators will be less likely to make their creations available on YouTube and other similar platforms, for fear of losing all control of them. The world will be poorer for it.

16.     An essential component of Defendant's business model—powering AI features and services with large-scale training data—includes the mass acquisition and ingestion of creators' videos scraped from YouTube.

17.     Defendant has profited substantially from its infringement of Plaintiffs' and Class Members' video content through Defendant's training of its generative AI products. Defendant's massive financial success would not have been possible without the video content created by Plaintiffs and Class Members, which was intended for streaming on YouTube.

18.     Plaintiffs bring this class action on behalf of themselves and on behalf of a

3
CONSOLIDATED CLASS ACTION COMPLAINT

nationwide class of YouTube creators whose works were scraped, ingested, and trained on without authorization, seeking statutory damages, injunctive relief, restitution, and all other remedies allowed by law pursuant to the DMCA § 1201(a) seeking an injunction and damages commensurate with the scope of Defendant's massive and ongoing infringement.

## THE PARTIES

19.     Plaintiff Ted Entertainment, Inc. ("TEI"), is an independent California based media company and content creator with over 5,800 original videos on YouTube, with a combined total of over 4 billion views. TEI has amassed a substantial following on YouTube with over 2.6 million subscribers to its channels. TEI owns and operates the channels "h3h3 Productions" and "H3 Podcast Highlights." H3H3 Productions appears with 155 videos in Panda-70M. H3 Podcast Highlights appears with 283 videos in Panda-70M. Plaintiff invested significant resources – time and money – into producing and publishing this video content and bringing awareness to its content.

20.     Plaintiff TEI is the creator of the videos identified in Exhibit A, all of which were uploaded exclusively to YouTube by Plaintiff. Plaintiff derives value from the works identified in Exhibit A through viewership, advertising, sponsorships, licensing, and related monetization.

21.     Plaintiff TEI and its owners – Ethan and Hila Klein – are longtime champions of the rights of YouTube creators. The Kleins helped define what constitutes fair use reaction videos and the good faith belief standard for DMCA counternotifications. TEI has championed online free speech and is currently helping define what reaction content does not constitute fair use to ensure YouTube content creators can enjoy the fruits of their labor.

22.     Plaintiff Matt Fisher is an individual and resident of the State of California.  He is a golf content creator who posts his original videos on YouTube, many of which are instructional. His channel is "MrShortGame Golf" on the YouTube platform.  He has over 500,000 subscribers and hundreds of millions of views.  Plaintiff has invested substantial time and money into bringing awareness around his content. MrShort Game appears with 8 videos in Panda-70M.

23.     Plaintiff Matt Fisher is the creator of the videos identified in Exhibit B, all of which were uploaded exclusively to YouTube by Plaintiff and all of which were included in datasets used by Defendant to train its generative AI models. Plaintiff derives value from the works identified in

4
CONSOLIDATED CLASS ACTION COMPLAINT

Exhibit B through viewership, advertising, sponsorships, licensing, and related monetization.

24.     Plaintiff Golfholics is a corporate entity organized pursuant to the laws of the State of California. It is a golf content channel that posted its original videos on YouTube. The channel is "Golfholics" on the YouTube platform. It has over 130,000 subscribers and millions of views. Plaintiff invested substantial time and money into bringing awareness around its content. Golfholics appears with 62 videos in Panda-70M..

25.     Plaintiff Golfholics is the creator of the videos identified in Exhibit C, all of which were uploaded exclusively to YouTube by Plaintiff and all of which were included in datasets used by Defendant to train its generative AI models. Plaintiff derives value from the works identified in Exhibit C through viewership, advertising, sponsorships, licensing, and related monetization.

26.     Defendant Apple Inc., is a Delaware corporation with its principal place of business at One Apple Park Way, Cupertino, CA 95014.

**JURISDICTION AND VENUE**

27.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different state than Apple. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 17 U.S.C. § 1201, et seq..

28.     The Court has supplemental jurisdiction over related state-law claims, if any, under 28 U.S.C. § 1367.

29.     Personal jurisdiction is proper because Defendant's principal place of business is in Cupertino, California, transacts business nationwide, purposefully avails itself of this forum, and a substantial part of the events or omissions giving rise to these claims occurred or were directed here.

30.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and/or 1400(a) because Defendant resides in, is found in, or may be sued in this District, and a substantial part of the events giving rise to the claims occurred here.

31.     Plaintiffs reserve the right to refine jurisdiction and venue allegations after discovery

and as additional facts become available.

## FACTUAL BACKGROUND

**A.    YouTube Employs TPMs that Function as Access Controls Over Video Files.**

32.    As noted above, Plaintiffs and the Class Members are content creators of audiovisual content. Plaintiffs and the Class Members create original video content that has been uploaded onto YouTube's video sharing platform.

33.    The audiovisual work at issue is embodied in digital form through encoded media streams and associated data structures that together constitute the work itself. The segmented streams and underlying media representations obtained by Defendant collectively comprise the copyrighted work and are not distinct from it.

34.    YouTube's "users"—the individuals who view the digital content available on YouTube—can watch and listen to videos for free on YouTube's advertising-supported service, but YouTube prevents access to the digital files underlying the content viewed by the user through YouTube's authorized playback mechanism.

35.    While YouTube permits members of the public to view audiovisual works through its platform, such permission is limited to access through YouTube's authorized playback environment and subject to the technological conditions imposed by its delivery systems.

36.    For example, YouTube does not authorize access to audiovisual works through automated extraction, direct retrieval of media streams, or reconstruction of works outside its controlled environment.

37.    YouTube does not provide users with direct access to audiovisual works in their native or fixed form. YouTube only delivers audiovisual works through a controlled streaming architecture that transmits segmented, time-limited portions of a work for ephemeral playback within YouTube's proprietary player environment.

38.    To protect against file level access, YouTube deploys multiple TPMs designed to control, restrict, and monitor access to the underlying video files and to deter extraction outside YouTube's controlled playback environment.

39.    YouTube's TPMs effectively control access to audiovisual works by requiring the

6
CONSOLIDATED CLASS ACTION COMPLAINT

application of information and processes with YouTube's authorization before a user may obtain the work in usable form.

40.    These TPMs control how videos are delivered and accessed. For example, YouTube uses temporary, expiring links to send pieces of a video; breaks videos into small segments that must be put together in a specific way; checks and controls each request to make sure it follows the proper sequence; and requires the video to be assembled and played through YouTube's own player rather than accessed directly.

41.    In simple terms, YouTube doesn't just hand over a video file to every user seeking to view content. It sends the video in pieces, through temporary links, and only lets those pieces be put together and played using its own system, while checking each step along the way.

42.    These measures function as access controls because they condition access to the audiovisual work on the application of authorized processes and prevent users from obtaining the work outside YouTube's controlled delivery system.

43.    Access to a work on YouTube therefore requires the application of a sequence of authorized processes, including the issuance and validation of session-specific tokens, execution of player-side instructions, and reconstruction of segmented media streams into a continuous audiovisual experience. The audiovisual work itself—i.e., the complete, machine-readable embodiment of the work capable of being copied, processed, or analyzed—cannot be accessed by the public absent compliance with these technological processes.

44.    The TPMs specifically alleged here include, among others: (1) an obfuscated signature system commonly referred to as a "rolling cipher," (2) IP-based blocking and rate limiting that restrict high-volume automated access, (3) short-lived, session-bound streaming URLs, (4) CAPTCHA human-verification challenges triggered by automated activity, and (5) proof-of-origin tokens that verify requests originating from authorized client environments.

45.    Each TPM is an access control which independently functions as a gatekeeping mechanism that must be satisfied before the audiovisual file can be retrieved, and circumvention of any one of them enables access to the file in a manner not authorized by YouTube or the owners of the content.

CONSOLIDATED CLASS ACTION COMPLAINT

46.    Defendant accessed and obtained the audiovisual works themselves—not merely "files" distinct from those works—by reconstructing and assembling the protected media streams outside YouTube's authorized environment.

47.    Defendant exceeded any authorized access by obtaining audiovisual works through methods that bypassed the technological conditions under which access is granted. Defendant's conduct therefore constituted access "without the authority of the copyright owner" within the meaning of 17 U.S.C. § 1201(a).

48.    On information and belief, Defendant employed automated systems and tools designed to bypass YouTube's TPMs by replicating and manipulating authorized request flows while avoiding enforcement mechanisms. These actions allowed Defendant to avoid, bypass, and impair technological measures that otherwise restrict access to audiovisual works, thereby constituting circumvention under 17 U.S.C. § 1201(a)(3)(A).

*TPM (1) - Rolling cipher*

49.    YouTube controls access to the underlying media file by withholding a usable file location unless the requesting client can transform an obfuscated signature parameter using proprietary logic embedded in the official YouTube player. The playback data delivered to users contains a scrambled signature that must be processed to produce a valid media request URL. Without performing this authorized transformation, the server will not deliver the audiovisual file. Thus, the rolling cipher controls access by requiring application of a specific computational process before the file can be obtained at all.

50.    YouTube's rolling cipher encryption measure acts as a digital lock, controlling access to content by protecting against unauthorized downloading of underlying media files. YouTube maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page. The file URL is encrypted using a complex and periodically changing algorithm – the rolling cipher – that is designed to impede external access to the underlying YouTube files. YouTube's player software uses a decryption routine to authenticate requests and deliver content only through approved interfaces. This TPM inhibits access to the

8
CONSOLIDATED CLASS ACTION COMPLAINT

underlying audiovisual files for the purposes of any downloading, copying or distribution of the audiovisual content. In other words, the rolling cipher controls access to copies of audiovisual content uploaded to the platform and impedes an ordinary user from creating a permanent, unrestricted download of audiovisual content made available on YouTube only for streaming and restricted downloading.

51.     The rolling cipher is a TPM measure within the meaning of 17 U.S.C. §1201(a) because it "effectively controls access" to copyrighted works by preventing users access to the files of video streams without first executing YouTube's proprietary decryption code.

*TPM (2) - IP blocking and rate limiting*

52.     YouTube monitors network behavior and restricts access when excessive or abusive request patterns are detected. Requests from an IP address that exceeds defined thresholds may be throttled, denied, or blocked entirely, preventing further retrieval of audiovisual data from that source. This mechanism controls access by limiting how frequently and at what scale a particular requester may obtain the file and by cutting off access altogether when abuse is detected.

53.     YouTube's infrastructure monitors the number and frequency of video requests originating from individual IP addresses. This system serves an important function. Even if a user were able to generate a valid media request for an individual video, YouTube's infrastructure is designed to prevent automated systems from retrieving large numbers of videos at scale.

54.     Once YouTube detects abnormal volume of access to files, the system can block the offending IP address from accessing YouTube's servers. This prevents automated scraping systems from accessing large volumes of copyrighted audiovisual content.

55.     This IP-based monitoring and blocking system therefore also functions as a TPM measure within the meaning of 17 U.S.C. §1201(a) because it "effectively controls access" to copyrighted works by restricting automated access to YouTube's underlying video files.

*TPM (3) - Session-bound, short-lived URLs*

56.     Even after a valid media URL is generated, YouTube restricts access by issuing URLs that are temporary, cryptographically signed, and tied to a particular playback session and client context. These URLs include authorization parameters such as expiration timestamps and

9
CONSOLIDATED CLASS ACTION COMPLAINT

client identifiers. Once the authorization window expires or the session ends, the server will refuse to deliver the audiovisual file in response to that URL. Accordingly, possession of a previously valid link does not provide continuing access to the file, and new authorization must be obtained to retrieve it. This mechanism therefore controls access by limiting when and from where the file may be requested.

57.    Because session-bound URLs expire automatically, any automated system attempting to access videos outside ordinary playback cannot rely on a static link and must instead repeatedly obtain fresh authorization parameters and regenerate valid media URLs. By programmatically renewing expired credentials and initiating new authorized sessions at machine speed, automated scraping tools can maintain continuous access to audiovisual files that would otherwise become unavailable once the original authorization lapses. This conduct circumvents the temporal and session-based restrictions imposed by YouTube and allows persistent retrieval of files in a manner not available to ordinary users. Circumventing this measure constitutes circumvention of a technological measure that effectively controls access to a copyrighted work in violation of 17 U.S.C. § 1201(a).

### TPM (4) - CAPTCHA challenges

58.    When traffic patterns indicate automated or suspicious activity, YouTube may require completion of a CAPTCHA challenge before allowing further requests to proceed. Until the challenge is successfully completed, the requesting client cannot obtain the data necessary to retrieve the audiovisual file. CAPTCHAs therefore function as an access control by conditioning continued access to content on proof that the requester is a human user rather than an automated system.

59.    Large-scale scraping operations necessarily generate request patterns that would ordinarily trigger such human-verification challenges. To continue accessing without interruption, automated systems must be configured either to evade detection, distribute requests across multiple machines, or otherwise prevent CAPTCHA enforcement from halting access. By avoiding or neutralizing these verification gates, such systems obtain audiovisual data without demonstrating the human interaction that YouTube requires for continued access. Defeating or bypassing this

human-verification mechanism constitutes circumvention of a technological measure that effectively controls access to copyrighted works in violation of 17 U.S.C. § 1201(a).

### *TPM (5) - Proof-of-origin tokens*

60.    YouTube further restricts access by requiring that requests for video segments include cryptographic tokens demonstrating that the request originates from an authorized client environment operating within the intended playback context. These tokens are generated during playback and validated by YouTube's servers before data is delivered. Requests lacking valid tokens, or presenting forged or replayed tokens, are denied or degraded. This mechanism controls access by preventing unauthorized software from directly requesting the audiovisual file unless it can present credentials proving it is an approved client.

61.    Automated tools operate outside YouTube's authorized player environment and therefore must extract, replicate, or reuse the necessary request parameters in order to obtain access to video data. By presenting such credentials outside their intended context, these tools can retrieve audiovisual files without operating as approved clients. This conduct bypasses the origin-verification function of the token system and enables direct access to media files that would otherwise be delivered only to authorized playback software. Such bypassing constitutes circumvention of a technological measure that effectively controls access to copyrighted works in violation of 17 U.S.C. § 1201(a).

### B.    YouTube's Terms of Service Reinforce their Technological Protection Measures

62.    YouTube's Terms of Service describe and reinforce YouTube's TPMs. YouTube's Terms of Service expressly prohibit scraping, unauthorized downloading, bulk extraction, or other forms of data mining of audiovisual content except through expressly permitted features or licensed APIs. These contractual restrictions operate together with YouTube's TPMs to prevent unlicensed access to creators' videos.

63.    According to YouTube's Terms of Service, content creators such as Plaintiffs who upload content onto YouTube grant license to YouTube for certain uses as well as to other users of YouTube to access content through YouTube's services; however, the license makes clear that it

11
CONSOLIDATED CLASS ACTION COMPLAINT

"does not grant any rights or permissions for a user to make use of [the] Content independent of the Service."[1]

64.    This language confirms that end users are not given access to the file itself, only the ability to view (*i.e.*, stream) through YouTube's controlled environment. YouTube's Terms of Service reflect YouTube's intent to use the TPMs described above to restrict access to the digital files underlying the videos that YouTube's users are allowed to stream through YouTube's platform.

65.    Streaming through YouTube and downloading permanent copies provide the user with different value propositions—watching and listening for free but seeing ads, versus possessing a permanent digital copy.

66.    Accordingly, scraping or bulk downloading is not merely copying material already provided; it is an act of unauthorized access to data files that YouTube affirmatively withholds from public download.

67.    In fact, during a Bloomberg interview about OpenAI (another generative text-to-video artificial intelligence competitor) scraping YouTube's CEO, Neal Mohan, confirmed that unauthorized scraping constitutes a violation of creators' rights and YouTubes Terms of Service stating, "From a creator's perspective, when a creator uploads their hard work to our platform, they have certain expectations. One of those expectations is that the terms of service is going to be abided by," Mohan said, "It does not allow for things like transcripts or video bits to be downloaded, and that is a clear violation of our terms of service. Those are the rules of the road in terms of content on our platform."[2]

68.    The scraping and acquisition processes used by Defendant to circumvent YouTube's TPMs were inconsistent with, and in violation of, YouTube's Terms of Service, which forbid scraping and mass downloading of videos.[3]

---

[1] "Terms of Service," YouTube, https://www.youtube.com/t/terms (last viewed March 11, 2026).
[2] Davey Alba & Emily Chang, *YouTube Says OpenAI Training Sora With Its Videos Would Break Rules*, Bloomberg (Apr. 4, 2024), https://www.bloomberg.com/news/articles/2024-04-04/youtube-says-openai-training-sora-with-its-videos-would-break-the-rules (video available at https://www.youtube.com/watch?v=FBZ__BeChRg).
[3] *Supra*, note 1 (prohibiting "access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as (continued).

12
CONSOLIDATED CLASS ACTION COMPLAINT

69.     Although YouTube offers downloading options to subscribers who pay for YouTube's "Premium" plan, YouTube still employs TPMs to restrict access. Specifically, YouTube prohibits all downloading audiovisual content except to the YouTube app.  Further, the "download" option only makes audiovisual content available for offline streaming—it does not provide the Premium subscriber with access to the audiovisual files. Accordingly, the audiovisual files cannot be transferred to any other device, but remain only for streaming on the app. Finally, the files are available only for offline streaming for a limited amount of time, at which point they will become available only for online streaming once again. For users who do not have a "Premium" plan, the "download" option on YouTube's player page is non-functional.

70.     YouTube's Terms of Service and policies reinforce the  variety of TPMs YouTube implements to restrict access to Plaintiffs' and Class Members' underlying audiovisual files.

**C.     Defendant Improperly Circumvented YouTube's Technological Protection Measures to Obtain Millions of YouTube Videos to Train Its Foundational AI Model.**

71.     As noted above, Defendant requires significant amounts of data to feed, train, improve, and commercialize Apple AI Video.

72.     Without authorization, Defendant accessed Plaintiffs' and Class Members' audiovisual content from YouTube for use in its training data for Apple AI Video. To do so, Defendant unlawfully circumvented YouTube's TPMs that YouTube implemented in its effort to impede the downloading of audiovisual content from its platform.

73.      Apple AI Video is not a research tool. It is Defendant's plan to commercialize a text-to-video generative AI model. Defendant is a for-profit company.

74.     Because Apple AI Video models are a core feature of Defendant's future plans, Defendant had an overwhelming incentive to acquire training data on an unprecedented scale. Rather than negotiate for lawful licenses, Defendant broke through YouTube's access protections to access the underlying files needed to utilize the massive datasets necessary to fuel Apple AI Video and, by extension, Defendant's broader product lines.

expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders;").

13
CONSOLIDATED CLASS ACTION COMPLAINT

75.     Defendant has sought to develop Apple AI Video so it is capable of, among other things, turning language prompts into audiovisual content. In other words, Defendant has sought to, and has had success with, creating an AI product that accepts language instruction and produces a video based on that instruction.

76.     The dataset central to Defendant's unlawful acquisition of training data for Apple AI Video is Panda-70M, a derivative dataset of HD-VILA-100M, compiled by Snap, Inc.

77.     Defendant's own researchers publicly admitted to training Apple AI Video on Panda-70M in a paper titled *STIV: Scalable Text and Image Conditioned Video Generation*, co-authored by fourteen named Apple employees.[4] In the paper's Section 3.1, under the heading "Data," the authors state: "our data sources include Panda-70M." Panda-70M is a dataset compiled from 3,098,462 YouTube videos — and consists of approximately 70.8 million video clips extracted from those YouTube sources, none of which were obtained with the authorization of YouTube or the copyright holders whose works they contain. By publishing this admission in a citable academic paper under Apple institutional affiliation, Defendant's own researchers confirmed in writing that Apple AI Video was trained on a dataset derived from YouTube content accessed through circumvention of YouTube's TPMs.

78.     The dataset consist entirely of pointers to YouTube content. Panda-70M does not contains the underlying audiovisual files. To use either dataset for AI training, a company must access, retrieve, and download every referenced video directly from YouTube—an act that requires circumventing YouTube's TPMs at scale.

79.     YouTube allows users to stream content but prohibits, through contractual terms and TPMs, accessing the underlying video file of the content it streams. Defendant obtained unauthorized access to audiovisual content by unlawfully accessing and stream ripping, converting streaming content into permanent, locally stored files, and by circumventing the TPMs specifically designed to prevent such access.

80.     The Panda-70M dataset functions as a map or index file identifying specific YouTube videos and clips by URL, video identifier, and timestamp. A single YouTube video may

---

[4] Zongyu Lin et al., *STIV: Scalable Text and Image Conditioned Video Generation*, arXiv:2412.07730 (Dec. 10, 2024), https://arxiv.org/pdf/2412.07730.

CONSOLIDATED CLASS ACTION COMPLAINT

be divided into numerous clips, each treated as a separate training sample. Extracting any clip requires independently accessing the source video on YouTube and isolating the designated segment, a process that constitutes a separate act of circumvention for each clip retrieved.

81.    Defendant obtained unauthorized access to audiovisual content to train its AI models by unlawfully "stream ripping" them—*i.e.*, converting the audiovisual streaming content into permanent, locally-stored files—from YouTube and circumventing TPMs specifically designed to prevent access for such use.

82.    Panda-70M was compiled by Snap Inc and released in 2024.[5] In a remarkable act of institutional irony, Snap, Inc. then published Panda-70M as an open-access blueprint (a detailed, step-by-step methodology for stream ripping millions of YouTube videos) while purporting to launder its own unlawful conduct by restricting downstream users to "non-commercial, research purposes only" and disclaiming that "[n]o commercial license, whether implied or otherwise, is granted in or to this dataset and code, unless you have entered into a separate agreement with Snap Inc. for such rights."[6]

83.    In other words, having itself circumvented YouTube's TPMs and copied millions of protected works without authorization or compensation, Snap handed the world a roadmap for doing the same; then absolved itself of responsibility by declaring the theft permissible so long as others kept it academic. Snap had no rights to grant or withhold. The underlying videos belong to the YouTube creators whose content Snap had already unlawfully circumvented and copied.

84.    The Panda 70M dataset consists of location identifiers that point to millions of YouTube videos or clips. None of them contains the underlying audiovisual files. To use them in training, a company must access, retrieve and download every referenced video directly from YouTube. Defendant used this dataset to initiate millions of individual downloads of protected YouTube content, all without authorization or compensation, all in violation of YouTube's TPMs, and all for the commercial purpose of building its foundational video model.

85.    Plaintiffs do not yet know the full extent of all datasets Defendant used to train

---

[5] Tsai-Shien Chen et al., *Panda-70M: Captioning 70M Videos with Multiple Cross-Modality Teachers*, arXiv:2402.19479 (Feb. 29, 2024), https://arxiv.org/abs/2402.19479.
[6] Panda-70M Project Page, Snap Research, https://snap-research.github.io/Panda-70M/

15
CONSOLIDATED CLASS ACTION COMPLAINT

Apple AI Video and any derivative or successor models. The identity, contents, sources, and provenance of all training datasets are exclusively within Defendant's possession, custody, and control. On information and belief, Defendant used additional datasets beyond those publicly disclosed that incorporated YouTube-sourced content obtained through the same circumvention processes alleged herein. The full scope of Defendant's unlawful data acquisition, including any datasets, scraping pipelines, or third-party data purchases that incorporated YouTube-sourced content, will be the subject of discovery.

### D. Defendant's Automated Scraping Required Circumvention of YouTube's Technological Protection Measures.

86. Bulk extraction of YouTube videos at the scale alleged here cannot occur without circumventing YouTube's layered TPMs, each of which independently controls access to the underlying audiovisual files. Illicit tools and services are specifically designed to defeat these protections, enabling automated systems to retrieve permanent copies of content that YouTube makes available only for streaming. This process is commonly known as "scraping" or "stream ripping." Under DMCA § 1201(a), circumvention of any single technological measure that effectively controls access to a copyrighted work is sufficient to establish liability. YouTube's protections are layered and overlapping, and the circumvention of one does not negate the effectiveness or legal significance of the others.

87. "Scraping" or "stream ripping" content involves the automated accessing and downloading of audio and video files directly from a website's servers rather than viewing the content through the provider's authorized playback environment.

88. Upon information and belief, in order to acquire "high-quality text-to-video generation," Defendant, directly and through agents, contractors, and affiliates, intentionally accessed large volumes of YouTube videos by scraping and/or using tools and workflows that bypass or evade YouTube's TPMs and usage restrictions, and then reproduced those videos to assemble training corpora for Defendant's AI models and services.

89. When Defendant scraped audio and video files from YouTube, Defendant did not simply access and download those files onto the YouTube app for offline streaming, as envisioned

by YouTube's Premium plan. Instead, Defendant improperly accessed the underlying audio and video files and downloaded those files into Defendant's own system, where Defendant had access over the files and where Defendant could store them indefinitely. These actions circumvented YouTube's TPMs, violated YouTube's Terms of Service, and are inconsistent with the access provided by YouTube's Premium plan.

90. Defendant also obtained its own separate audiovisual datasets directly through its own independent scraping of YouTube's video sharing platform.

91. To retrieve audiovisual files at scale, Defendant was required to defeat TPM (1), the rolling cipher that protects the true media file URL. On information and belief, Defendant used one or more descrambling tools designed to defeat YouTube's proprietary signature-transformation logic, allowing automated systems to generate valid file requests outside the authorized player environment and thereby obtain the underlying media files directly. Such tools include, for example, the open-source program yt-dlp, which is specifically engineered to descramble, replicate, or extract YouTube's proprietary signature-transformation logic and circumvent the access controls YouTube uses to prevent unauthorized downloading.

92. A descrambling tool such as yt-dlp works by replicating or extracting the signature-transformation process that YouTube uses to protect its media URLs, allowing a user to bypass the authorized streaming environment entirely and retrieve the underlying video and audio files directly from YouTube's servers. Tools of this kind can be used to automatically merge separate audio and video streams and to download entire playlists at scale. On information and belief, Defendant used yt-dlp or a substantially similar descrambling tool for precisely this purpose.

93. To deploy a descrambling tool such as yt-dlp, a user must first obtain and configure the program, along with ancillary software necessary to merge video and audio streams into complete audiovisual files. Once configured, the tool can be directed at individual videos or entire playlists by supplying the URL for each target video. The result is a complete audiovisual file retrieved outside of and in circumvention of YouTube's authorized playback environment.

94. In simpler terms, a descrambling tool such as yt-dlp acts as a bootleg key for the lock imposed by YouTube's rolling cipher. On information and belief, Defendant used yt-dlp or a

substantially similar tool to improperly access and download audiovisual files from YouTube and merge them into complete audiovisual packages for ingestion into their generative AI training pipeline.

95. Defendant also defeated TPM (2), YouTube's IP-based monitoring and blocking system, which restricts high-volume accessing and downloading from a single source. On information and belief, Defendant implemented an IP-rotation scheme so that when YouTube detected automated activity and blocked one address, accessing and downloading could immediately resume from another. This allowed continuous access to audiovisual files despite YouTube's efforts to detect and terminate abusive activity.

96. YouTube uses automated programs to monitor activity from IP addresses, detect high-volume accessing and downloading behavior, and block those IP addresses from further access to audiovisual content on the platform. An IP-rotation scheme is specifically designed to defeat this monitoring system by cycling through different IP addresses to avoid detection and blocking.

97. Executing an IP-rotation scheme at the scale necessary to download the volume of files indexed in any one of the datasets and required to train Apple AI Video necessarily required the use of virtual machines or substantially similar infrastructure. A single physical machine with a fixed IP address would have been detected and blocked almost immediately given the volume of requests involved. On information and belief, Defendant deployed virtual machines, cloud computing infrastructure, or substantially similar technology to rotate IP addresses at scale, ensuring that when YouTube detected and blocked one address, Defendant's downloading operation could immediately resume from another.

98. On information and belief, by repeatedly cycling through IP addresses in this manner, Defendant ensured that their automated downloading operation could continue uninterrupted even after YouTube detected and blocked individual addresses. The sheer volume of videos necessary to train Apple AI Video makes any alternative explanation implausible. The full details of the specific infrastructure Defendant used to execute this scheme will be the subject of discovery.

18
CONSOLIDATED CLASS ACTION COMPLAINT

99. Processes such as these allowed Defendant to bypass YouTube's player page and avoid YouTube's monitoring systems in order to access and scrape content from YouTube.

100. Defendant's conduct necessarily circumvented TPM (3), the use of session-bound, short-lived media URLs. Because these URLs expire and cannot be reused, automated tools must repeatedly obtain fresh authorization parameters and regenerate valid links in order to continue downloading. By programmatically renewing access credentials outside ordinary playback sessions, Defendant maintained uninterrupted access to files that would otherwise become unavailable once the original authorization lapsed.

101. At scale, Defendant's automated activity would also trigger TPM (4), CAPTCHA challenges intended to distinguish human users from automated systems. To continue retrieving videos without interruption, Defendant's infrastructure distributed requests across numerous machines and operated in a manner designed to avoid or neutralize such verification barriers, thereby obtaining audiovisual data without the human interaction required for continued access.

102. Defendant further circumvented TPM (5), YouTube's proof-of-origin token system, which requires requests for video segments to present credentials demonstrating that they originate from an authorized playback environment. Automated downloading tools operate outside that environment and therefore must extract, replicate, or reuse the necessary request parameters in order to retrieve video data directly, allowing Defendant to access and obtain files that would otherwise be delivered only to approved clients.

103. Defendant did not obtain the consent of YouTube, Plaintiffs or other Class Members to conduct its scraping activities.

104. The automated system used by Defendant to access video content from YouTube was intentionally designed and utilized to circumvent YouTube's TPMs.

105. To be clear, Defendant's generative AI models are not "watching" YouTube in order to be trained. Rather, data improperly accessed and downloaded from YouTube is being uploaded into Defendant's generative AI models to develop and improve Defendant's products.

106. Defendant knew or should have known its conduct violated YouTube's TPMs.

107.    Defendant's actions constitute a violation of the DMCA's anti-circumvention provisions, which state, among other things, that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(a).

E.    **Defendant's Actions Caused Harm to Plaintiffs and Class Members**

108.    At no time did Defendant seek or obtain Plaintiffs' or Class Members' authorization to access and use the videos Defendant used to train its generative AI models.

109.    At no time did Defendant seek or obtain Plaintiffs' or Class Members' authorization, nor did Defendant compensate Plaintiffs or the Class Members for the access, copying, ingestion, and use of their YouTube videos in AI training and related workflows.

110.    Plaintiffs and Class Members used YouTube as their platform of choice to upload their video content in substantial part due to YouTube's protective measures, including TPMs and Terms of Service, that prohibit the type of scraping, unauthorized accessing and downloading, bulk extraction, and other forms of data mining of audiovisual content utilized by Defendant to obtain Plaintiffs' video content.

111.    The harm Defendant is causing goes beyond the immediate economic consequences of unauthorized and uncompensated extraction and use of Plaintiffs' and Class Members' works. It degrades the rights of creators to control their works, determine whether future uses of their work align with their values, and decide the products or services with which they wish to be associated.

112.    Defendant's conduct also caused concrete harm to the licensing market for Plaintiffs' and Class Members' content. The market for licensing video content to AI training pipelines is an emerging and recognized market. By obtaining Plaintiffs' content through circumvention rather than licensing, Defendant deprived Plaintiffs of licensing fees they could have negotiated and suppressed the development of that market by establishing a pattern of unauthorized extraction as an alternative to licensing.

113.    As a direct and proximate result of Defendants' circumvention, Plaintiff has suffered actual damages, including loss of control over his copyrighted works, impairment of market value, and costs incurred to identify, remove, and prevent further distribution of the infringing content.

20
CONSOLIDATED CLASS ACTION COMPLAINT

This harm to the value and market for Plaintiffs' works constitutes a concrete, non-speculative injury sufficient to establish Article III standing independent of any statutory damages.

## CLASS ACTION ALLEGATIONS

114.    **Class Definition:** Plaintiffs bring this action on behalf of themselves and other similarly situated individuals defined as follows:

> All persons and entities in the United States who are creators and/or rights-holders of YouTube-hosted videos that Apple accessed at the file level by scraping, downloading, or otherwise extracting underlying video files from YouTube through circumvention of YouTube's TPMs (the "Class").

115.    The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

116.    Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

117.    Plaintiff reserves the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

118.    The proposed Class meets the criteria for certification under Rule 23 of the Federal Rules of Civil Procedure.

119.    Numerosity. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiffs now, but Plaintiffs estimates that there are thousands of Class Members.

120.    Commonality. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct.  The following questions of law and fact are common to the

21
CONSOLIDATED CLASS ACTION COMPLAINT

Class:

a.  Whether YouTube employs TPMs "that effectively control access" to copyrighted audiovisual works within the meaning of 17 U.S.C. § 1201(a);

b.  Whether Defendant's defeated, avoided, bypassed, removed, deactivated, impaired, or otherwise circumvented YouTube's TPMs, including through automated tools used to download or otherwise obtain unauthorized access to the Plaintiffs' and Class Members' copyrighted content on YouTube;

c.  Whether Apple's circumvention and/or trafficking conduct was willful, knowing, and undertaken for commercial advantage or private financial gain;

d.  Whether Defendant retrieved, scraped, downloaded, or otherwise acquired the underlying YouTube videos referenced in Panda-70M and any other datasets used by Apple at massive scale to build training material for its AI systems;

e.  Whether Plaintiffs and Class Members suffered damages from Defendant's misconduct.

121.  Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' video content, like that of every other Class Member, was made available on YouTube and improperly altered and used by Defendant to train Defendant's generative AI models for commercial purposes. Plaintiffs' claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and no defenses are unique to Plaintiffs. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

122.  Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's interests coincide with, and not antagonistic to, those of the Class Members.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

123.  Predominance. Defendant has engaged in a common course of conduct toward

Plaintiffs and Class Members, in that Plaintiffs' and Class Members' video content was unlawfully downloaded, altered and used by Defendant in the same way. The fact that Apple AI Video was a foundational model underscores that Defendant's conduct was uniform across the Class: every video unlawfully accessed from YouTube was ingested into the same core model that underpins Defendant's product ecosystem. This commonality further demonstrates the predominance of shared legal and factual issues among Class Members. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

124.    Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

125.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

126.    Ascertainability. Finally, all members of the proposed Class are readily ascertainable. Defendant used datasets that contain the full lists of URLs and video identifiers for every YouTube video incorporated into the training pipeline. Those identifiers allow the parties to determine exactly which videos were used and to match each video to its creator through YouTube's public channel and authorship information. Because the datasets provide a complete map of the videos Defendant downloaded, the identities of the affected creators are identifiable

through straightforward reference to the URLs and corresponding channel data.

## CLAIM FOR RELIEF

### Violation of the DMCA (Anti-Circumvention) 17 U.S.C. § 1201(a)

127.   Plaintiffs repeat, reallege, and incorporates the allegations contained in the previous paragraphs as if fully set forth herein.

128.   Plaintiffs are owners of valid copyrights in audiovisual works distributed through the YouTube platform. Plaintiffs and Class Members own all rights, title, and interest in and to the claims asserted in this action, including all claims for violation of 17 U.S.C. § 1201.

129.   YouTube employs TPMs that effectively control access to Plaintiffs' and Class Members' copyrighted works within the meaning of 17 U.S.C. § 1201(a)(3)(B). YouTube's TPMs prohibit scraping, unauthorized downloading, bulk extraction, or other forms of data mining of audiovisual content.

130.   These TPMs require the application of information, processes, and authorized interactions in order to access the audiovisual works in usable form. These measures function to prevent access to Plaintiffs' works outside YouTube's authorized delivery environment. These restrictions prevent unlicensed access to the underlying video files, not simply reproduction of content.

131.   When each of Plaintiffs' and Class Members works were published to YouTube, YouTube automatically applied TPMs that control access to and prevent unauthorized access to these audiovisual files.

132.   Defendant knowingly and intentionally circumvented YouTube's TPMs by deploying automated systems designed to avoid, bypass, and impair those TPMs.

133.   Defendant used automated tools for the sole purpose of circumventing YouTube's technological barriers that effectively control access to extracted files never made available to the public. Specifically, Defendant employed measures to access, extract, copy, and download Plaintiffs' and Class Members' content from YouTube without authorization. In doing so, Defendant improperly obtained millions of videos from YouTube's platform.

134.   Defendant's conduct constitutes circumvention because it involved the avoidance

and bypassing of technological measures that control access to copyrighted works, without the authority of Plaintiffs or the Class Members (i.e., the copyright owners).

135. This distinction is critical: viewing a YouTube video through YouTube's authorized and playback mechanisms does not provide access to the underlying file. Defendant's circumvention tools broke through that access barrier, triggering liability under §1201.

136. As a direct and proximate result of Defendant's violations, Plaintiffs have been injured and are entitled to all remedies available under 17 U.S.C. § 1203, including statutory damages, injunctive relief, and attorneys' fees.

137. Plaintiffs and Class Members have been harmed by Defendant's conduct because Defendant has taken their content without authorization or compensation. Defendant's circumvention of YouTube's technological measures has facilitated Defendant's ongoing and mass-scale copyright infringement through its unauthorized and uncompensated use of the content in its training data. Defendant accessed, downloaded, stored and utilized those videos to assemble training corpora for Defendant's AI models and services.

138. Each act of circumvention constitutes a separate violation of §1201. Plaintiffs and the Class Members are entitled to statutory damages, injunctive relief, impoundment, and attorneys' fees and costs under 17 U.S.C. §1203.

139. Each of Defendant's acts of infringement is a willful violation as Defendant specifically utilized automated tools designed to evade YouTube's TPMs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request a judgment in their favor and against Defendant as follows:

    a. Certification of this action as a class action and appointment of Plaintiffs and Plaintiffs' counsel to represent the Class;

    b. Declare that Defendant has willfully circumvented the copyright protection systems of YouTube intended to protect Plaintiffs' and the Class Members's audiovisual content.

    c. For statutory damages (up to the maximum allowed by law per violation),

25
CONSOLIDATED CLASS ACTION COMPLAINT

injunctive relief, and attorneys' fees and costs under 17 U.S.C. §1203;

d. For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiffs' and the Class Members' copyright-protected content, including a preliminary and permanent injunction requiring that Defendant and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Plaintiff's or the Class Members' exclusive rights under federal law, including without limitation in the content identified in Exhibits A, B, and C;

e. For an award of pre-judgment and post-judgment interest, to the fullest extent available, on any monetary award made part of the judgment against Defendant; and

f. For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

140.    Plaintiffs demand a trial by jury on all claims for which trial by jury is proper.

CONSOLIDATED CLASS ACTION COMPLAINT

Dated: April 3, 2026

Respectfully submitted,

*/s/ Rom Bar-Nissim*
Rom Bar-Nissim (SBN 293356)
**HEAH BAR-NISSIM LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Tel: (310) 432-2836
Rom@HeahBarNissim.com

Jarrett Lee Ellzey (*pro hac vice*)
Tom Kherkher (*pro hac vice*)
Leigh S. Montgomery (*pro hac vice*)
**ELLZEY KHERKHER SANFORD MONTGOMERY LLP**
4200 Montrose Street, Suite 200
Houston, TX 77006
JEllzey@EKSM.com
TKherkher@EKSM.com
LMontgomery@EKSM.com

*Attorneys for Plaintiffs and the Proposed Class*

CONSOLIDATED CLASS ACTION COMPLAINT