Rom Bar-Nissim (SBN 293356)
HEAH BAR-NISSIM LLP
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 432-2836
Rom@HeahBarNissim.com

Jarrett Lee Ellzey (*pro hac vice*)
Tom Kherkher (*pro hac vice*)
Leigh S. Montgomery (*pro hac vice forthcoming*) ELLZEY KHERKHER SANFORD MONTGOMERY LLP
4200 Montrose Street, Suite 200
Houston, TX 77006
Telephone: (888) 350-3931
JEllzey@EKSM.com
TKherkher@EKSM.com
LMontgomery@EKSM.com

Rohit Nath (CA 316062)
Michael Gervais (CA 5122890)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
rnath@susmangodfrey.com
mgervais@susmangodfrey.com
sfrazier@susmangodfrey.com

Max Lalon Tribble, Jr (CA 326851)
Justin Nelson (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Avenue, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
mtribble@susmangodfrey.com
jnelson@susmangodfrey.com

Amy Gregory (*pro hac vice*)
Morgan McCollum (*pro hac vice*)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
agregory@susmangodfrey.com
mmccollum@susmangodfrey.com

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

MATT FISHER, individually and on behalf of all others similarly situated,

Plaintiff,

v.

APPLE INC.,

Defendant

Case No.: 3:26-CV-02936-RS

**<u>SECOND AMENDED CLASS ACTION COMPLAINT</u>**

**DEMAND FOR JURY TRIAL**

Plaintiff Matt Fisher ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), by and through his undersigned counsel, files this Second Amended Complaint against Apple Inc. ("Defendant") for violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201. The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to himself and his own actions and counsel's investigation, and upon information and belief as to all other matters, are as follows:

## NATURE OF THE ACTION

1. This is a nationwide class action for violations of the DMCA's anti-circumvention provisions, 17 U.S.C. § 1201(a), arising from Defendant unlawfully circumventing technological protection measures to access and scrape millions of copyrighted videos from the online video viewing platform, YouTube, in order to feed, train, improve, and commercialize Defendant's large-scale generative text-to-video artificial intelligence ("AI") models (hereinafter referred to as "Apple AI Video").

2. After an IP address is authenticated, YouTube allows the verified public to view audiovisual works only through controlled streaming, keeping its underlying video files locked away behind careful access restrictions.

3. YouTube does not provide public access to the underlying audiovisual works themselves, but instead delivers those works through a controlled streaming architecture that includes technological protection measures ("TPMs") which require the application of authorized processes, including tokenized requests, segmented delivery protocols, and player-based reconstruction.

4. Defendant published a peer-reviewed academic paper authored by its own researchers publicly disclosing that it trained Apple AI Video on Panda-70M—a dataset derived entirely from millions of YouTube videos that were themselves extracted from YouTube through circumvention of YouTube's TPMs.

5. Defendant deployed tools designed to evade and circumvent YouTube's TPMs by deploying automated systems that replicated and manipulated authorized request flows while evading enforcement mechanisms, thereby gaining access to the underlying works in a form not

available to the public and outside the conditions authorized by the copyright owner.

6. On information and belief, Defendant used automated video-downloading programs combined with virtual machines that rotated IP addresses to avoid detection and blocking, enabling the mass unauthorized access and extraction of videos at the scale necessary to train Apple AI Video. Defendant then used Plaintiff's and Class Members' intellectual property for its own commercial gain in developing and commercializing Apple AI Video. In doing so, Defendant has violated the law (and YouTube's Terms of Service), which were intended to protect Plaintiff and others similarly situated.

7. By accessing, scraping, and downloading those files, Defendant deliberately circumvented YouTube's access controls to obtain the training data necessary to build and commercialize Apple AI Video.

8. This case does not concern ordinary viewing or downstream copying of publicly available content. It concerns Defendant's deliberate circumvention of YouTube's controlled streaming architecture to access copyrighted works in a form and manner not made available to the public. YouTube does not provide open access to audiovisual works themselves, but instead conditions access on the application of specific technical processes that Defendant intentionally bypassed.

9. Plaintiff and the Class Members whom Plaintiff seeks to represent are content creators who upload their audiovisual content to YouTube. On information and belief, the audiovisual content of Class Members was among the video content utilized by Defendant to train Apple AI Video and related generative AI models.

10. In uploading content to YouTube, content creators are authorizing and instructing YouTube to provide protection to the video content through YouTube's anti-circumvention software. In fact, YouTube's anti-circumvention software is a driving factor behind many content creators' decision to upload their video content to YouTube.

11. Rather than seek permission or pay a fair price for the audiovisual content hosted on YouTube, Defendant harvested content creators' protected and copyrighted videos for commercial use and at scale without consent or compensation to the content creators.

12. Defendant's actions were not only unlawful, but an unconscionable attack on the community of content creators whose content is used to fuel the multi-trillion-dollar generative AI industry without any compensation.

13. Content creators such as Plaintiff and the Class Members will never be able to claw back the intellectual property unlawfully copied and used by Defendant to train its generative AI models. Once AI ingests content, that content is stored in its neural network and not capable of deletion or retraction. Defendant's actions constitute abuse and exploitation of content creators' work for Defendant's profit.

14. Most YouTube videos are not registered with the U.S. Copyright Office. That lack of registration, however, does not render them valueless or leave them unprotected. Content creators invest time, skill, and resources into producing their works, and they rely on YouTube's TPMs to safeguard their files from unauthorized access. Because copyright registration is not a prerequisite for protection against unlawful circumvention of access controls, this claim is especially critical where Defendant's misconduct lies in breaking through access barriers that prevent anyone from obtaining the underlying files in the first place.

15. It is also critical to protect a flourishing internet ecosystem. In a world where Defendant and others can circumvent technological protections to exploit copyrighted works without authorization with impunity, creators will be less likely to make their creations available on YouTube and other similar platforms, for fear of losing all control of them. The world will be poorer for it.

16. An essential component of Defendant's business model—powering AI features and services with large-scale training data—includes the mass acquisition and ingestion of creators' videos scraped from YouTube.

17. Defendant has profited substantially from its infringement of Plaintiff's and Class Members' video content through Defendant's training of its generative AI products. Defendant's massive financial success would not have been possible without the video content created by Plaintiff and Class Members, which was intended for streaming on YouTube.

18. Plaintiff brings this class action on behalf of himself and on behalf of a nationwide

class of YouTube creators whose works were scraped, ingested, and trained on without authorization, seeking statutory damages, injunctive relief, restitution, and all other remedies allowed by law pursuant to the DMCA § 1201(a) seeking an injunction and damages commensurate with the scope of Defendant's massive and ongoing infringement.

**THE PARTIES**

19. Plaintiff Matt Fisher is an individual and resident of the State of California. He is a golf content creator who posts his original videos on YouTube, many of which are instructional. His channel is "MrShortGame Golf" on the YouTube platform. He has over 500,000 subscribers and hundreds of millions of views. Plaintiff has invested substantial time and money into bringing awareness around his content. MrShortGame Golf appears with 8 videos in Panda-70M.

20. Plaintiff Matt Fisher is the creator of original video works uploaded exclusively to YouTube by Matt Fisher, through which Matt Fisher derives value via viewership, advertising, sponsorships, licensing, and related monetization.

21. Defendant Apple Inc. is a Delaware corporation with its principal place of business at One Apple Park Way, Cupertino, CA 95014.

**JURISDICTION AND VENUE**

22. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different state than Apple. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 17 U.S.C. § 1201, *et seq.*

23. The Court has supplemental jurisdiction over related state-law claims, if any, under 28 U.S.C. § 1367.

24. Personal jurisdiction is proper because Defendant maintains its principal place of business in Cupertino, California, transacts business nationwide, purposefully avails itself of this forum, and a substantial part of the events or omissions giving rise to these claims occurred or were directed here.

25. Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and/or

1400(a) because Defendant resides in, is found in, or may be sued in this District, and a substantial part of the events giving rise to the claims occurred here.

26. Plaintiff reserves the right to refine jurisdiction and venue allegations after discovery and as additional facts become available.

## FACTUAL BACKGROUND

### A. Plaintiff and Class Members Create and Control Their Audiovisual Works on YouTube.

27. As noted above, Plaintiff and the Class Members are independent content creators of audiovisual content.

28. Plaintiff and the Class Members create video content and upload their video content onto YouTube's video sharing platform.

29. A YouTube creator retains continuous control over the visibility of each video and may change that visibility at any time. A creator may designate a video as "public," "unlisted," or "private." A "public" video may be viewed by anyone and may appear in search results and recommendations. An "unlisted" video may be viewed only by those who have the video's URL. An "unlisted" video does not appear on the creator's channel or, by default, in YouTube's search results. A "private" video may be viewed only by the creator and those whom the creator specifically invites. This visibility setting is a toggle that the creator may change at any time, and in any direction, after a video is uploaded. Through this control, the creator determines who may view the work and on what terms, and YouTube's technological protection measures operate to enforce the creator's chosen restriction.

30. YouTube's "users"—the individuals who view the digital content available on YouTube—can watch and listen to videos without paying money on YouTube's advertising-supported service. In exchange for watching videos without paying money, such "users" must watch advertisements placed on the video by YouTube. In any event, YouTube prevents users from accessing the underlying files of the work in any other manner. YouTube employs TPMs to ensure that users can view videos uploaded to YouTube only through the authorized playback mechanism.

31. Although YouTube does not charge most viewers money to stream a video, access

is not free. YouTube operates on a pay-per-view model in which the price of admission is the advertising impression. To view a work through YouTube's authorized playback environment, a non-Premium viewer must submit to YouTube's delivery of advertisements within and alongside the work. For monetized channels, including Plaintiff's, each authorized view generates payment: the viewer's attention is sold to advertisers, and YouTube remits a share of the resulting advertising revenue to the creator whose work drew that attention.

32. The only way to view works on YouTube without receiving advertisements is to pay money by purchasing a YouTube Premium subscription. Under this model, YouTube shares a portion of the subscription fee with creators in proportion to Premium watch time. Regardless of whether a user watches a video under the Premium subscription model or not, every authorized view is a compensated view – *i.e.*, the viewer pays with money or pays with attention. YouTube's authorized playback environment is the turnstile through which that payment is collected.

33. The technological protection measures alleged herein are what make this pay-per-view model function as a gate. Just as a traditional pay-per-view broadcast conditions access to a program on payment of the fee, YouTube conditions access to a work on passage through its authorized playback environment, where the toll, whether an advertising impression or a Premium subscription, is exacted. A viewer cannot refuse the toll and view the work anyway; the TPMs ensure that access occurs only through the tollbooth. When Defendant accessed and extracted Plaintiff's and Class Members' works at the file level, it did so the works without tendering either currency – *i.e.*, no advertisement was served, no impression was recorded, no Premium watch time accrued, and no revenue of any kind flowed to the creators whose works were accessed without authorization.

34. To enforce its prohibitions on downloading content, YouTube uses technological processes and tools to detect and block access to files for unauthorized downloading. For example, YouTube monitors downloading activity and blocks IP addresses that make too many download attempts in a specified period. Indeed, the first thing YouTube's servers do when any requester attempts to reach the site is verify that the requesting IP address is not one YouTube has identified as an offender. Before YouTube delivers any content whatsoever, whether a watch page, player

code, or a single byte of audiovisual data, the requesting IP address is screened against YouTube's abuse-detection thresholds and blocklists. A request originating from a blocked IP address is refused at the threshold and receives nothing: no page, no player, and no work.

35. YouTube has employed a variety of TPMs to restrict access to Plaintiff's and the Class Members' audiovisual files. For example, YouTube does not provide users with a readily available downloading option and it has implemented a number of tools, such as the Rolling Cipher and IP Blocking, that operate to restrict users' ability to access audiovisual material.

36. Content creators, including Plaintiff and Class Members, rely on the TPMs and YouTube's Terms of Service in deciding to upload their audiovisual content to YouTube. Content creators, including Plaintiff and Class Members, expect that their works will not be accessed without compensation outside of YouTube's playback system.

**B. YouTube Deploys Multiple Distinct TPMs that Control Access to the Underlying Video Files.**

37. While YouTube permits members of the public to view audiovisual works through its platform, such permission is limited to access through YouTube's authorized playback environment and subject to the technological conditions imposed by its delivery systems.

38. For example, YouTube does not authorize access to audiovisual works through automated processes, direct retrieval of media streams, or reconstruction of works outside its controlled environment.

39. YouTube does not provide users with direct access to audiovisual works in their native or fixed form. YouTube only delivers audiovisual works through a controlled streaming architecture that transmits segmented, time-limited portions of a work for ephemeral playback within YouTube's proprietary player environment.

40. As a result, the complete audiovisual file is never made available as a complete, usable file on the viewer's device. When a user streams a video, YouTube continuously loads only short, sequential segments of the work into a temporary memory buffer, each segment retrieved through a separate authorized request and discarded after playback. At no point during ordinary streaming does the viewer's device hold the assembled work in a form the viewer can locate, open, copy, or export. The viewer experiences continuous playback, but the underlying file remains

within YouTube's controlled delivery system and is never deposited "in the open" on the viewer's machine.

41. Even in the limited circumstance in which YouTube authorizes a paying subscriber to save a video for offline viewing through its YouTube Premium service—for example, to watch on a flight—the underlying file is still never released in usable form. The content saved through that authorized feature is stored as encrypted, segmented data locked inside the YouTube application, tied to the specific device and account, and playable only through YouTube's own player. It does not appear in the device's file system as an ordinary, openable video file. The work cannot be located, accessed, copied, transferred to or by another device, or played outside the YouTube application, remains subject to YouTube's control, including expiration if the subscription lapses or the device does not periodically reconnect to YouTube. At no point, whether through ordinary streaming or through this authorized offline feature, does YouTube hand the user an intact, unencrypted copy of the audiovisual file. Access to the work remains available only through YouTube and only through the application of YouTube's authorized processes.

42. To protect against file level access, YouTube deploys multiple TPMs designed to control, restrict, and monitor access to the underlying video files and to deter unauthorized uses outside YouTube's controlled playback environment.

43. These TPMs control how videos are accessed, viewed and delivered by users. For example, YouTube uses temporary, expiring links to send pieces of a video; breaks videos into small segments that must be put together in a specific way; checks and controls each request to make sure it follows the proper sequence; and requires the video to be assembled and played through YouTube's own player rather than accessed directly.

44. In simple terms, YouTube does not just hand over a video file to every user seeking to view content. It sends the video in pieces, through temporary links, and only lets those pieces be put together and played using its own system, while checking each step along the way. This limits a user to streaming through YouTube's authorized streaming mechanism and locks a user out of the ability to access the audiovisual file in any other manner.

45. These measures function as access controls because they condition access to the

audiovisual work on the application of authorized processes and prevent users from accessing the work outside YouTube's controlled delivery system.

46. Viewing a work on YouTube therefore requires the application of a sequence of authorized processes, including the issuance and validation of session-specific tokens, execution of player-side instructions, and reconstruction of segmented media streams into a continuous audiovisual experience. The audiovisual work itself – *i.e.*, the complete, machine-readable embodiment of the work capable of being viewed, copied, processed, or analyzed – cannot be accessed by the public absent a means of bypassing or circumventing these specific controls.

47. The TPMs specifically alleged here include, among others: (1) an obfuscated signature system commonly referred to as a "rolling cipher," (2) IP-based blocking and rate limiting that restrict high-volume automated access, (3) short-lived, session-bound streaming URLs, (4) CAPTCHA human-verification challenges triggered by automated activity, and (5) proof-of-origin tokens that verify requests originating from authorized client environments.

48. Each TPM independently functions as a gatekeeping mechanism that must be circumvented before the underlying audiovisual file of the work can be accessed, and circumvention of any one of them enables access to the file in a manner not authorized by YouTube or the owners of the content.

49. Defendant accessed and obtained the audiovisual works themselves – not merely "files" distinct from those works – by reconstructing and assembling the protected media streams outside YouTube's authorized environment.

50. YouTube grants the public one narrow form of access to a given work: transient, segmented playback rendered within YouTube's authorized player. YouTube categorically withholds a different form of access to that same work: its complete, fixed, machine-readable embodiment, capable of being stored, copied, processed, or computationally analyzed. No member of the public, paying or otherwise, is ever given access to the work in that form. As to the work in its complete, fixed form, YouTube's TPMs do not merely restrict what a user may do after access is granted; they prevent that form of access from ever occurring.

51. Defendant exceeded any authorized access by accessing the audiovisual works

through methods that bypassed the technological conditions placed on the video streams. Defendant's conduct therefore constituted access "without the authority of the copyright owner" within the meaning of 17 U.S.C. § 1201(a).

52. Defendant employed automated systems and tools designed to bypass YouTube's TPMs by replicating and manipulating authorized request flows while avoiding enforcement mechanisms. These actions allowed Defendant to avoid, bypass, and impair technological measures that otherwise restrict access to audiovisual works, thereby constituting circumvention under 17 U.S.C. § 1201(a)(3)(A).

53. **TPM (1) - Rolling cipher:** YouTube controls access to the underlying media file by withholding a usable file location unless the requesting client can transform an obfuscated signature parameter using proprietary logic embedded in the official YouTube player. The playback data delivered to users contains a scrambled signature that must be processed to produce a valid media request URL. Without performing this authorized transformation, the server will not deliver the audiovisual file. Thus, the rolling cipher controls access by requiring application of a specific computational process before the file can be obtained at all. This signature transformation is required in the ordinary course of YouTube's operation, for every playback of every video by every requester: YouTube's servers never deliver audiovisual file data absent a validly transformed signature. Ordinary viewers satisfy the requirement because YouTube's official player performs the authorized transformation on their behalf, with YouTube's authority. The measure is not dormant, incidental, or triggered only in unusual circumstances; it executes on every request for the file.

54. YouTube's rolling cipher encryption measure acts as a digital lock, controlling access to content by protecting against unauthorized access to the underlying media files. YouTube maintains two different URLs for any given video: First is the page URL, which is visible to the user. The page URL is for the webpage where the video playback occurs. Second is the file URL, which is not visible to the user. The file URL is for the video file itself that is played within the page. The file URL is encrypted using a complex and periodically changing algorithm – the rolling cipher – that is designed to impede external access to the underlying YouTube files. YouTube's

player software uses a decryption routine to authenticate requests and deliver content only through approved interfaces. This TPM inhibits access to the underlying audiovisual files for any unauthorized purpose. At no time is any audiovisual file available at a static, unsigned, publicly accessible location. Every request for audiovisual file data must present valid, unexpired, cryptographically signed parameters generated through YouTube's authorized processes, and absent those parameters YouTube's servers refuse to deliver the file, no matter who makes the request or how the requester learned of the file's location.

55. The rolling cipher is a TPM within the meaning of 17 U.S.C. § 1201(a) because it "effectively controls access" to copyrighted works by preventing users from accessing the files of video streams without first executing YouTube's proprietary decryption code.

56. **TPM (2) - IP blocking and rate limiting:** YouTube monitors network behavior and restricts access when excessive or abusive request patterns are detected. When YouTube detects abnormal request volume originating from a particular IP address, it blocks that IP address from accessing the YouTube platform entirely. A blocked IP address cannot stream, browse, or retrieve any content from YouTube's servers. This mechanism conditions continued access to all content on the platform on compliance with YouTube's authorized access parameters and blocks certain types of users (those who have violated YouTube's Terms of Service) from YouTube's website. This IP verification is performed at the outset of every request, before any content is served, and it operates on every requester, human or automated, in the ordinary course of YouTube's operation. For any given request, the gate is either up or down: YouTube verifies the requesting IP address and serves content, or it refuses the request outright and serves nothing. The fact that most requesters pass this verification does not mean they never encountered it, any more than a doorman who admits most guests after checking identification at the door is not controlling access to the building.

57. YouTube's infrastructure monitors the number and frequency of requests originating from individual IP addresses against defined thresholds. Once those thresholds are exceeded, YouTube's servers cut off platform access from the offending IP address entirely and prevent any further retrieval of audiovisual content from that source. This system serves a

gatekeeping function that extends beyond any individual video or file. It controls whether a requester may access any content on YouTube at all.

58. Because this IP-level verification runs before every request, it determines whether access occurs at all. A requester whose IP address fails YouTube's verification cannot stream, view, browse, or retrieve any work in any form. In the ordinary course of its operation, this measure therefore requires the application of information, namely a verified network identity that YouTube's servers must screen and approve, before access to any work is granted, within the meaning of 17 U.S.C. § 1201(a)(3)(B).

59. YouTube's IP verification runs without interruption. An IP address's status with YouTube is dynamic and is re-evaluated with every request. An address may be verified and served on one request, then flagged moments later when its accumulated behavior, such as request volume, frequency, or pattern, crosses YouTube's abuse thresholds. Once flagged, the address is treated as a suspected malicious actor: YouTube interrupts service to it by serving a CAPTCHA challenge, throttling its requests, or refusing them outright. A flagged address does not regain access by simply continuing to request content; it must satisfy YouTube's challenge or lose access. The verification is, in short, always running: every request from every address is checked against that address's then-current status.

60. **TPM (3) - Session-bound, short-lived URLs:** Even after a valid media URL is generated, YouTube restricts access by issuing URLs that are temporary, cryptographically signed, and tied to a particular playback session and client context. These URLs include authorization parameters such as expiration timestamps and client identifiers. Once the authorization window expires or the session ends, the server will refuse to deliver the audiovisual file in response to that URL. Accordingly, possession of a previously valid link does not provide continuing access to the file, and new authorization must be obtained to retrieve it. This mechanism therefore controls access by limiting when and from where the file may be requested.

61. Because session-bound URLs expire automatically, any automated system attempting to access videos outside ordinary playback cannot rely on a static link and must instead repeatedly obtain fresh authorization parameters and regenerate valid media URLs. By

programmatically renewing expired credentials and initiating new authorized sessions at machine speed, automated scraping tools can maintain continuous access to audiovisual files that would otherwise become unavailable once the original authorization lapses. This conduct circumvents the temporal and session-based restrictions imposed by YouTube and allows persistent retrieval of files in a manner not available to ordinary users. Circumventing this measure constitutes circumvention of a technological measure that effectively controls access to a copyrighted work in violation of 17 U.S.C. § 1201(a).

62. **TPM (4) - CAPTCHA challenges:** When traffic patterns indicate automated or suspicious activity, YouTube typically requires completion of a CAPTCHA challenge before allowing further requests to proceed. CAPTCHAs are tests designed to separate human users from bots, often requiring identification of objects in grainy images. Until the challenge is successfully completed, the requesting client cannot stream the audiovisual work. CAPTCHAs therefore perform a gatekeeping function by prohibiting a certain type of user (a bot) from accessing the platform and the audiovisual works hosted on it.

63. Large-scale scraping operations like Defendant's necessarily generate request patterns that trigger CAPTCHA challenges. Rather than completing those challenges, automated systems circumvent them by rotating IP addresses. IP rotation allows an automated system to abandon an IP address at the moment a CAPTCHA challenge is triggered and immediately resume platform access from a new IP address, bypassing the human-verification requirement entirely without ever responding to it. The new IP address presents to YouTube's servers as a fresh, undetected requester, allowing uninterrupted access to audiovisual content that YouTube's CAPTCHA mechanism was designed to gate.

64. IP rotation therefore defeats both TPM (2) and TPM (4) through the same mechanism. When YouTube's IP-based monitoring system detects abnormal request volume and moves to cut off platform access, IP rotation prevents that access control from taking effect by substituting a new IP address before the block can be enforced. When YouTube's CAPTCHA system moves to verify human interaction, IP rotation bypasses that verification gate by escaping to a new IP address. In both cases, the circumvention is affirmative and technological. It is not mere

disregard of a restriction, but active manipulation of the access environment to prevent YouTube's controls from operating as designed.

65. At the scale required to compile datasets (such as Panda-70M) comprising tens of millions of video clips, IP rotation was not optional. YouTube's IP-based access controls and CAPTCHA enforcement would have halted any such operation long before completion absent systematic circumvention. The use of IP rotation at that scale constitutes circumvention of technological measures that effectively control access to copyrighted works in violation of 17 U.S.C. §1201(a).

66. **<u>TPM (5) - Proof-of-origin tokens:</u>** YouTube further restricts access to its platform by requiring that all requests for video segments include cryptographic proof-of-origin tokens that validate the request as originating from an authorized YouTube playback environment. These tokens are generated dynamically by YouTube's official player software during an active, authenticated playback session. The token generation process ties each token to specific session parameters, including the client identity, the playback context, and a time-bounded authorization window. YouTube's servers validate these tokens before delivering any audiovisual data. Requests that lack a valid token, present an expired token, or present a token generated outside an authorized playback context are refused. No audiovisual file data is delivered absent successful token validation.

67. Because proof-of-origin tokens are generated exclusively within YouTube's authorized player environment and are cryptographically bound to that environment, software operating outside that environment cannot obtain valid tokens through ordinary means. To access audiovisual files at scale, automated scraping tools must affirmatively extract, replicate, spoof, or systematically reuse token parameters generated within authorized sessions. This requires the automated tool to interact with YouTube's player infrastructure specifically to harvest the credentials that YouTube's servers require before delivering content, and then to present those credentials outside the authorized context for which they were generated.

68. Descrambling tools such as yt-dlp are specifically designed to access, extract, and reuse these session-bound authorization parameters. By parsing YouTube's player response and

extracting the token parameters required for server authentication, descrambling tools obtain and reuse credentials that YouTube's token system generates exclusively for authorized playback sessions. This allows descrambling tools to present valid-appearing proof-of-origin credentials to YouTube's servers while operating entirely outside the authorized playback environment those credentials were designed to authenticate. Without this extraction and reuse of token parameters, YouTube's servers would refuse to deliver the requested audiovisual files. Because YouTube's session-level anomaly detection can invalidate token generation for sessions exhibiting suspicious behavior, Defendant's IP rotation practices served the additional function of enabling continuous generation of new authorized sessions from which fresh proof-of-origin tokens could be harvested, allowing uninterrupted access to audiovisual file data at scale.

69. The proof-of-origin token system is a TPM within the meaning of 17 U.S.C. §1201(a) because it effectively controls access to copyrighted works by conditioning the delivery of audiovisual file data on cryptographic proof that the requester is operating within YouTube's authorized playback environment. Defendant's extraction and reuse of those tokens outside their authorized context constitutes circumvention of a technological measure that effectively controls access to copyrighted works in violation of 17 U.S.C. §1201(a).

70. These technological protection measures were in place on YouTube at all times relevant to this Complaint, and Defendant could not have accessed the underlying video files referenced in the datasets without circumventing them.

### C. YouTube's Terms of Service Reinforce their Technological Protection Measures

71. YouTube's Terms of Service describe and reinforce YouTube's TPMs. YouTube's Terms of Service expressly prohibit scraping, unauthorized downloading, bulk extraction, or other forms of data mining of audiovisual content except through expressly permitted features or licensed APIs. These contractual restrictions operate together with YouTube's TPMs to prevent unlicensed access to creators' videos. Indeed, YouTube's Terms of Service prohibit unauthorized access in express terms: a user may not "access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except:

(a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders." Access itself, and not merely downstream use, is conditioned on authorization.

72. According to YouTube's Terms of Service, content creators such as Plaintiff who upload content onto YouTube grant license to YouTube for certain uses as well as to other users of YouTube to access content through YouTube's services; however, the license makes clear that it "does not grant any rights or permissions for a user to make use of [the] Content independent of the Service."[1]

73. This language confirms that end users are not given access to the file itself, only the ability to view (*i.e.*, stream) through YouTube's controlled environment. YouTube's Terms of Service reflect YouTube's intent to use the TPMs described above to restrict access to the digital files underlying the videos that YouTube's users are allowed to stream through YouTube's platform.

74. Streaming through YouTube and downloading permanent copies provide the user with different value propositions—watching and listening in exchange for viewing advertisements, versus possessing a permanent digital copy. "Free" viewing is a misnomer: ad-supported streaming is paid access in which the consideration is the viewer's attention, tendered through YouTube's authorized player.

75. Accordingly, scraping or bulk downloading is not merely copying material already provided; it is an act of unauthorized access to data files that YouTube affirmatively withholds from public download.

76. In fact, during a Bloomberg interview about OpenAI (another generative text-to-video artificial intelligence competitor) scraping, YouTube's CEO, Neal Mohan, confirmed that unauthorized scraping constitutes a violation of creators' rights and YouTube's Terms of Service, stating, "From a creator's perspective, when a creator uploads their hard work to our platform, they have certain expectations. One of those expectations is that the terms of service is going to be abided by," Mohan said, "It does not allow for things like transcripts or video bits to be downloaded,

[1] "Terms of Service," YouTube, https://www.youtube.com/t/terms (last viewed March 11, 2026).

and that is a clear violation of our terms of service. Those are the rules of the road in terms of content on our platform."[2]

77. The scraping and acquisition processes used by Defendant to circumvent YouTube's TPMs were inconsistent with, and in violation of, YouTube's Terms of Service, which forbid scraping and mass downloading of videos.[3]

78. Although YouTube offers downloading options to subscribers who pay for YouTube's "Premium" plan, YouTube still employs TPMs to restrict access. Specifically, YouTube prohibits all downloading of audiovisual content except to the YouTube app. Further, the "download" option only makes audiovisual content available for offline streaming—it does not provide the Premium subscriber with access to the audiovisual files. Accordingly, the audiovisual files cannot be transferred to any other device, but remain only for streaming on the app. Finally, the files are available only for offline streaming for a limited amount of time, at which point they will become available only for online streaming once again. For users who do not have a "Premium" plan, the "download" option on YouTube's player page is non-functional.

79. YouTube's Terms of Service and policies reinforce the variety of TPMs YouTube implements to restrict access to Plaintiff's and Class Members' underlying audiovisual files.

### D. Defendant Improperly Circumvented YouTube's Technological Protection Measures to Obtain Millions of YouTube Videos to Train Its AI Models.

80. As noted above, Defendant requires significant amounts of data to feed, train, improve, and commercialize Apple AI Video.

81. Without authorization, Defendant accessed Plaintiff's and Class Members' audiovisual content from YouTube for use in its training data for Apple AI Video. To do so,

---

[2] Davey Alba & Emily Chang, *YouTube Says OpenAI Training Sora With Its Videos Would Break Rules*, Bloomberg (Apr. 4, 2024), https://www.bloomberg.com/news/articles/2024-04-04/youtube-says-openai-training-sora-with-its-videos-would-break-the-rules (video available at https://www.youtube.com/watch?v=FBZ__BeChRg).

[3] *Supra*, note 1 (prohibiting "access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders;").

Defendant unlawfully circumvented YouTube's TPMs that YouTube implemented in its effort to impede the downloading of audiovisual content from its platform.

82. Apple AI Video is not a research tool. It is Defendant's plan to commercialize a text-to-video generative AI model. Defendant is a for-profit company.

83. Because Apple AI Video models are a core feature of Defendant's future plans, Defendant had an overwhelming incentive to acquire training data on an unprecedented scale. Rather than negotiate for lawful licenses, Defendant broke through YouTube's access protections to access the underlying files needed to utilize the massive datasets necessary to fuel Apple AI Video and, by extension, Defendant's broader product lines.

84. Defendant has sought to develop Apple AI Video so it is capable of, among other things, turning language prompts into audiovisual content. In other words, Defendant has sought to, and has had success with, creating an AI product that accepts language instruction and produces a video based on that instruction.

85. The dataset central to Defendant's unlawful acquisition of training data for Apple AI Video is Panda-70M, a derivative dataset of HD-VILA-100M, compiled by Snap Inc.

86. Defendant's own researchers publicly admitted to training Apple AI Video on Panda-70M in a paper titled *STIV: Scalable Text and Image Conditioned Video Generation*, co-authored by fourteen named Apple employees.[4] In the paper's Section 3.1, under the heading "Data," the authors state: "our data sources include Panda-70M." Panda-70M is a dataset compiled from 3,098,462 YouTube videos — and consists of approximately 70.8 million video clips extracted from those YouTube sources, none of which were obtained with the authorization of YouTube or the copyright holders whose works they contain. By publishing this admission in a citable academic paper under Apple institutional affiliation, Defendant's own researchers confirmed in writing that Apple AI Video was trained on a dataset derived from YouTube content accessed through circumvention of YouTube's TPMs.

87. The dataset consists entirely of pointers to YouTube content. Panda-70M does not

[4] Zongyu Lin et al., *STIV: Scalable Text and Image Conditioned Video Generation*, arXiv:2412.07730 (Dec. 10, 2024), https://arxiv.org/pdf/2412.07730.

contain the underlying audiovisual files. To use the dataset for AI training, a company must access, retrieve, and download every referenced video directly from YouTube—an act that requires circumventing YouTube's TPMs at scale.

88. YouTube allows users to stream content but prohibits, through contractual terms and TPMs, accessing the underlying video file of the content it streams. Defendant obtained unauthorized access to audiovisual content by unlawfully accessing and stream ripping, converting streaming content into permanent, locally stored files, and by circumventing the TPMs specifically designed to prevent such access.

89. The Panda-70M dataset functions as a map or index file identifying specific YouTube videos and clips by URL, video identifier, and timestamp. A single YouTube video may be divided into numerous clips, each treated as a separate training sample. Extracting any clip requires independently accessing the source video on YouTube and isolating the designated segment, a process that constitutes a separate act of circumvention for each clip retrieved.

90. Defendant obtained unauthorized access to audiovisual content to train its AI models by unlawfully "stream ripping" them—*i.e.*, converting the audiovisual streaming content into permanent, locally-stored files—from YouTube and circumventing TPMs specifically designed to prevent access for such use.

91. Panda-70M was compiled by Snap Inc. and released in 2024.[5] In a remarkable act of institutional irony, Snap Inc. then published Panda-70M as an open-access blueprint (a detailed, step-by-step methodology for stream ripping millions of YouTube videos) while purporting to launder its own unlawful conduct by restricting downstream users to "non-commercial, research purposes only" and disclaiming that "[n]o commercial license, whether implied or otherwise, is granted in or to this dataset and code, unless you have entered into a separate agreement with Snap Inc. for such rights."[6]

92. In other words, having itself circumvented YouTube's TPMs and accessed millions

---

[5] Tsai-Shien Chen et al., *Panda-70M: Captioning 70M Videos with Multiple Cross-Modality Teachers*, arXiv:2402.19479 (Feb. 29, 2024), https://arxiv.org/abs/2402.19479.

[6] Panda-70M Project Page, Snap Research, https://snap-research.github.io/Panda-70M/

of protected works at the file level without authorization or compensation, Snap handed Defendant a roadmap for doing the same.

93. The Panda-70M dataset consists of location identifiers that point to millions of YouTube videos or clips. None of them contains the underlying audiovisual files. To use them in training, a company must access, retrieve, and download every referenced video directly from YouTube. Defendant used this dataset to initiate millions of individual downloads of protected YouTube content, all without authorization or compensation, all in violation of YouTube's TPMs, and all for the commercial purpose of building its foundational video model.

94. Plaintiff does not yet know the full extent of all datasets Defendant used to train Apple AI Video and any derivative or successor models. The identity, contents, sources, and provenance of all training datasets are exclusively within Defendant's possession, custody, and control. On information and belief, Defendant used additional datasets beyond those publicly disclosed that incorporated YouTube-sourced content obtained through the same circumvention processes alleged herein. The full scope of Defendant's unlawful data acquisition, including any datasets, scraping pipelines, or third-party data purchases that incorporated YouTube-sourced content, will be the subject of discovery.

### E. Defendant's Automated Scraping Required Circumvention of YouTube's Technological Protection Measures.

95. Bulk extraction of YouTube videos at the scale alleged here cannot occur without circumventing YouTube's layered TPMs, each of which independently controls access to the underlying audiovisual files. Illicit tools and services are specifically designed to defeat these protections, enabling automated systems to retrieve permanent copies of content that YouTube makes available only for streaming. This process is commonly known as "scraping" or "stream ripping." Under DMCA § 1201(a), circumvention of any single technological measure that effectively controls access to a copyrighted work is sufficient to establish liability. YouTube's protections are layered and overlapping, and the circumvention of one does not negate the effectiveness or legal significance of the others.

96. "Scraping" or "stream ripping" content involves the automated accessing and

downloading of audio and video files directly from a website's servers rather than viewing the content through the provider's authorized playback environment.

97. Upon information and belief, in order to acquire "high-quality text-to-video generation," Defendant, directly and through agents, contractors, and affiliates, intentionally accessed large volumes of YouTube videos by scraping and/or using tools and workflows that bypass or evade YouTube's TPMs and usage restrictions, and then reproduced those videos to assemble training corpora for Defendant's AI models and services.

98. When Defendant scraped audio and video files from YouTube, Defendant did not simply access and download those files onto the YouTube app for offline streaming, as envisioned by YouTube's Premium plan. Instead, Defendant improperly accessed the underlying audio and video files and downloaded those files into Defendant's own system, where Defendant had access over the files and where Defendant could store them indefinitely. These actions circumvented YouTube's TPMs, violated YouTube's Terms of Service, and are inconsistent with the access provided by YouTube's Premium plan.

99. Defendant also obtained its own separate audiovisual datasets directly through its own independent scraping of YouTube's video sharing platform.

100. To retrieve audiovisual files at scale, Defendant was required to defeat TPM (1), the rolling cipher that protects the true media file URL. On information and belief, Defendant used one or more descrambling tools designed to defeat YouTube's proprietary signature-transformation logic, allowing automated systems to generate valid file requests outside the authorized player environment and thereby obtain the underlying media files directly. Such tools include, for example, the open-source program yt-dlp, which is specifically engineered to descramble, replicate, or extract YouTube's proprietary signature-transformation logic and circumvent the access controls YouTube uses to prevent unauthorized downloading.

101. A descrambling tool such as yt-dlp works by replicating or extracting the signature-transformation process that YouTube uses to protect its media URLs, allowing a user to bypass the authorized streaming environment entirely and retrieve the underlying video and audio files directly from YouTube's servers. Tools of this kind can be used to automatically merge separate audio and

video streams and to download entire playlists at scale. On information and belief, Defendant used yt-dlp or a substantially similar descrambling tool for precisely this purpose.

102. To deploy a descrambling tool such as yt-dlp, a user must first obtain and configure the program, along with ancillary software necessary to merge video and audio streams into complete audiovisual files. Once configured, the tool can be directed at individual videos or entire playlists by supplying the URL for each target video. The result is a complete audiovisual file retrieved outside of and in circumvention of YouTube's authorized playback environment.

103. In simpler terms, a descrambling tool such as yt-dlp acts as a bootleg key for the lock imposed by YouTube's rolling cipher. On information and belief, Defendant used yt-dlp or a substantially similar tool to improperly access and download audiovisual files from YouTube and merge them into complete audiovisual packages for ingestion into its generative AI training pipeline.

104. Defendant also defeated TPM (2), YouTube's IP-based monitoring and blocking system, which restricts high-volume accessing and downloading from a single source. On information and belief, Defendant implemented an IP-rotation scheme so that when YouTube detected automated activity and blocked one address, accessing and downloading could immediately resume from another. This allowed continuous access to audiovisual files despite YouTube's efforts to detect and terminate abusive activity.

105. YouTube uses automated programs to monitor activity from IP addresses, detect high-volume accessing and downloading behavior, and block those IP addresses from further access to audiovisual content on the platform. An IP-rotation scheme is specifically designed to defeat this monitoring system by cycling through different IP addresses to avoid detection and blocking. Rotating IP addresses is not passive disregard of a technological measure; it is an affirmative technological act. Each rotation manufactures and presents to YouTube’s verification systems a new, artificial network identity, engineered so that a requester that would ordinarily fail YouTube’s IP verification is able to pass it instead. It is the digital equivalent of returning to a checkpoint in a fresh disguise bearing new credentials after having been turned away.

106. This IP verification is continuous, not a one-time checkpoint. YouTube’s systems

evaluate the requesting IP address on every request, and a given address's standing is provisional at all times. An address that YouTube's systems verified and admitted a moment earlier is continually reassessed as it continues to make requests; the instant its request pattern crosses YouTube's abuse thresholds, that same address is reclassified as a suspected malicious actor and flagged. Once flagged, the address no longer passes freely: YouTube escalates, throttling the address, interposing a CAPTCHA challenge, or blocking it outright, and thereby withholds the access the address previously enjoyed. Because the check never stops, a requester bent on file-level access cannot simply clear the gate once and proceed. That is precisely why Defendant rotated IP addresses: when one address was flagged and served a CAPTCHA or otherwise restricted access to the YouTube platform, Defendant abandoned it and substituted a fresh, unflagged address, resetting its standing to zero and defeating the very verification that had just been imposed. The rotation is a direct response to an ever-present access check, not the exploitation of an open door.

107. Executing an IP-rotation scheme at the scale necessary to download the volume of files indexed in any one of the datasets and required to train Apple AI Video necessarily required the use of virtual machines or substantially similar infrastructure. A single physical machine with a fixed IP address would have been detected and blocked almost immediately given the volume of requests involved. On information and belief, Defendant deployed virtual machines, cloud computing infrastructure, or substantially similar technology to rotate IP addresses at scale, ensuring that when YouTube detected and blocked one address, Defendant's downloading operation could immediately resume from another.

108. On information and belief, by repeatedly cycling through IP addresses in this manner, Defendant ensured that its automated downloading operation could continue uninterrupted even after YouTube detected and blocked individual addresses. The sheer volume of videos necessary to train Apple AI Video makes any alternative explanation implausible. The full details of the specific infrastructure Defendant used to execute this scheme will be the subject of discovery.

109. Processes such as these allowed Defendant to bypass YouTube's player page and avoid YouTube's monitoring systems in order to access and scrape content from YouTube.

110. Defendant's conduct necessarily circumvented TPM (3), the use of session-bound,

short-lived media URLs. Because these URLs expire and cannot be reused, automated tools must repeatedly obtain fresh authorization parameters and regenerate valid links in order to continue downloading. By programmatically renewing access credentials outside ordinary playback sessions, Defendant maintained uninterrupted access to files that would otherwise become unavailable once the original authorization lapsed.

111. At scale, Defendant's automated activity would also trigger TPM (4), CAPTCHA challenges intended to distinguish human users from automated systems. To continue retrieving videos without interruption, Defendant's infrastructure distributed requests across numerous machines and operated in a manner designed to avoid or neutralize such verification barriers, thereby obtaining audiovisual data without the human interaction required for continued access.

112. Defendant further circumvented TPM (5), YouTube's proof-of-origin token system, which requires requests for video segments to present credentials demonstrating that they originate from an authorized playback environment. Automated downloading tools operate outside that environment and therefore must extract, replicate, or reuse the necessary request parameters in order to retrieve video data directly, allowing Defendant to access and obtain files that would otherwise be delivered only to approved clients.

113. Defendant did not obtain the consent of YouTube, Plaintiff or other Class Members to conduct its scraping activities.

114. The automated system used by Defendant to access video content from YouTube was intentionally designed and utilized to circumvent YouTube's TPMs.

115. To be clear, Defendant's generative AI models are not "watching" YouTube in order to be trained. Rather, data improperly accessed and downloaded from YouTube is being uploaded into Defendant's generative AI models to develop and improve Defendant's products.

116. Defendant knew or should have known its conduct violated YouTube's TPMs.

117. Defendant's actions constitute a violation of the DMCA's anti-circumvention provisions, which state, among other things, that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

**F. Defendant's Actions Caused Harm to Plaintiff and Class Members**

118. At no time did Defendant seek or obtain Plaintiff's or Class Members' authorization to access and use the videos Defendant used to train its generative AI models.

119. At no time did Defendant seek or obtain Plaintiff's or Class Members' authorization, nor did Defendant compensate Plaintiff or the Class Members for the access, copying, ingestion, and use of their YouTube videos in AI training and related workflows.

120. Plaintiff and Class Members used YouTube as their platform of choice to upload their video content in substantial part due to YouTube's protective measures, including TPMs and Terms of Service that prohibit the type of scraping, unauthorized accessing and downloading, bulk extraction, and other forms of data mining of audiovisual content utilized by Defendant to obtain Plaintiff's video content.

121. Plaintiff and Class Members suffer concrete and particularized economic injuries that are distinct from the bare statutory violation. These injuries take six independent forms, each of which is sufficient to establish Article III and statutory standing.

122. First, Plaintiff and Class Members who participate in YouTube's Partner Program lost per-view advertising revenue that YouTube's monetization system would otherwise have generated. YouTube's advertising model operates as follows: viewers who access content through YouTube's authorized streaming environment without a Premium subscription are served advertisements; YouTube remits a share of the resulting advertising revenue to content creators. Each authorized stream by a non-Premium viewer generates a monetizable advertising impression that feeds this revenue-sharing system. When Defendant accessed Plaintiff's videos by circumventing YouTube's TPMs, those retrievals generated no advertising impressions and no advertising revenue for Plaintiff and Class Members. The economic value that Plaintiff and Class Members would have received had Defendant engaged in any authorized form of access, including licensing the content directly, was instead extracted at zero cost.

123. Second, Plaintiff and Class Members lost YouTube Premium revenue that YouTube's subscription monetization system would otherwise have generated. When a viewer accesses content through YouTube's authorized streaming environment as a YouTube Premium

subscriber, no advertisement is served. Instead, YouTube shares a portion of the viewer's monthly membership fee with the creator, compensating the creator for the view in lieu of advertising revenue.[7] YouTube Premium thereby gives creators a secondary revenue stream in addition to advertising revenue. This revenue is allocated based on watch time: YouTube distributes Premium membership revenue to creators based on how much watch time they earn from Premium subscribers. Creators collectively receive 55% of YouTube Premium subscription revenue, with individual payouts determined by each channel's share of total Premium watch time. Because Defendant accessed Plaintiff's content entirely outside YouTube's authorized streaming environment, no Premium watch time was recorded and no Premium subscription revenue was allocated to Plaintiff or Class Members. Every video retrieved by Defendant through circumvention of YouTube's TPMs represents a loss of both advertising revenue and Premium subscription revenue that authorized access would have generated.

124. Third, Plaintiff and Class Members who had not yet qualified for YouTube's Partner Program at the time of Defendant's conduct suffered direct economic injury to their monetization prospects. YouTube conditions Partner Program eligibility on a channel accumulating minimum thresholds of watch hours and subscribers. Each view generated through YouTube's authorized streaming environment counts toward satisfying those thresholds and carries direct, measurable economic value as progress toward monetization eligibility. Because Defendant accessed Plaintiff's content through automated tools that bypassed YouTube's streaming infrastructure entirely, no view count was registered and no watch time accumulated. Plaintiff and Class Members were thereby deprived of view counts and watch hours that would otherwise have contributed to Partner Program qualification, delaying or impairing their ability to monetize their channels.

125. Fourth, Plaintiff and Class Members, regardless of monetization status, suffered economic injury through the loss of algorithmic amplification. YouTube's recommendation algorithm uses view counts, watch time, and engagement metrics to determine which videos to surface to new audiences. Legitimate streaming views generate algorithmic signals that drive organic channel growth, subscriber acquisition, and expanded audience reach, each of which

[7] YouTube, *How YouTube Premium supports creators*, Google Support, https://support.google.com/youtube/answer/7060016?hl=en (last visited April 9, 2026).

translates directly into economic value for the content creator. Because Defendant's automated tools bypassed YouTube's streaming infrastructure entirely, no view count was registered, no watch time accumulated, and no algorithmic signal was generated. Plaintiff and Class Members were thereby deprived of the organic growth, subscriber acquisition, and expanded monetization potential that legitimate streaming of the same content would have produced. This injury extends to every Class Member who uploaded content to YouTube, regardless of whether their channel was enrolled in the Partner Program at the time of Defendant's conduct.

126. Fifth, Defendant's conduct also caused concrete harm to the market for Plaintiff's and Class Members' content. Instead of seeking to purchase a copy of the audiovisual file from Plaintiff and members of the Class, Defendant chose to illegally access and download a copy for free, by bypassing the technological protection measures preventing such access on YouTube's platform.

127. Sixth, Plaintiff and Class Members suffered injury in the loss of control of their works. The DMCA's purpose, in large part, was to encourage content creators to make their works available on the internet without fear of losing total control over them. The loss of control over digital files embodying copyrighted works—e.g., the audiovisual files at issue here—effectively undermines any ability to ensure that they are fairly compensated for exploitation of their works.

128. As a direct and proximate result of Defendant's circumvention, Plaintiff and Class Members have suffered actual damages, including loss of control over their copyrighted works, impairment of market value, and costs incurred to identify, remove, and prevent further exploitation of the files Defendant unlawfully accessed and obtained.

## TOLLING

129. The statute of limitations for claims under 17 U.S.C. § 1201 is three years from the date the claim accrued. *See* 17 U.S.C. § 1203(c). A claim under § 1201 accrues when the circumvention occurs, that is, when the defendant actually retrieves protected content by defeating the applicable technological protection measures.

130. The datasets identified herein contain no audiovisual files—only references to such audiovisual files. No circumvention therefore occurred when any such dataset was published. The

actionable conduct is Defendant's subsequent use of each dataset to access, stream rip, and download the referenced videos directly from YouTube. That circumvention occurred when Defendant retrieved each video file, and each such retrieval constitutes a separate act of circumvention. The date of publication of any dataset is therefore legally irrelevant to accrual. To the extent any act of circumvention falls within the three-year period preceding the filing of this complaint, this action is timely on its face. To the extent any act of circumvention predates that period, the limitations period is independently tolled as alleged below.

131. Because Defendant kept its accessing and scraping of YouTube videos a secret, Plaintiff and Class Members could not have known of Defendant's conduct despite their reasonable diligence in investigating their claims. The technical process by which AI training materials are compiled, and the act of retrieving the underlying files through circumvention, are not information available through ordinary inquiry by content creators. Defendant possessed, and continues to possess, exclusive knowledge of the specific tools, infrastructure, and processes it used to retrieve audiovisual files from YouTube.

132. The doctrine of fraudulent concealment independently tolls the limitations period. The identification of a specific dataset, or even video URLs contained within a specific dataset, does not place a plaintiff on inquiry notice of a circumvention claim. The circumvention act is the retrieval of the files, and, as alleged above, Defendant has concealed the tools, infrastructure, and methods it used to defeat YouTube's TPMs, and that concealment prevented Plaintiff and Class Members from discovering the facts necessary to assert a claim.

133. The publicly available versions of the datasets at issue contained only video identifiers, URLs, and metadata—not the underlying audiovisual files—and did not identify content creators by name, channel, or any other human-readable identifier. No individual content creator could reasonably be expected to audit every paper published by a technology company, nor to access each of the millions of URLs in a dataset to determine whether any particular video is the creator's own work. Plaintiff and Class Members had no direct contact or interaction with Defendant and no means from which they could have discovered the facts concerning Defendant's circumvention.

134. Because Defendant affirmatively concealed its conduct, Plaintiff and Class Members had no knowledge of the alleged conduct, or of any facts that would have caused a reasonably diligent person to investigate whether Defendant circumvented YouTube's TPMs, until, at the earliest, December 10, 2024, when Apple employees first publicly disclosed in the *STIV* paper that Apple had used the Panda-70M training corpus.

## <u>CLASS ACTION ALLEGATIONS</u>

135. <u>Class Definition</u>: Plaintiff brings this action on behalf of himself and other similarly situated individuals defined as follows:

> All persons and entities whose videos were posted on YouTube and that Defendant accessed at the file level by scraping, downloading, or otherwise extracting underlying video files from YouTube (the "Class").

136. The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment or preliminary approval of a settlement.

137. Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

138. Plaintiff reserves the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

139. The proposed Class meets the criteria for certification under Rule 23 of the Federal Rules of Civil Procedure.

140. <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiff now, but Plaintiff estimates that there are thousands of Class Members.

141. <u>Commonality</u>. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has

acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

a. Whether YouTube employs TPMs "that effectively control access" to copyrighted audiovisual works within the meaning of 17 U.S.C. § 1201(a);

b. Whether Defendant defeated, avoided, bypassed, removed, deactivated, impaired, or otherwise circumvented YouTube's TPMs, including through automated tools used to download or otherwise obtain unauthorized access to the Plaintiff's and Class Members' copyrighted content on YouTube;

c. Whether Apple's circumvention and/or trafficking conduct was willful, knowing, and undertaken for commercial advantage or private financial gain;

d. Whether Defendant retrieved, scraped, downloaded, or otherwise acquired the underlying YouTube videos referenced in Panda-70M and any other datasets used by Apple at massive scale to build training material for its AI systems;

e. Whether Plaintiff and Class Members suffered damages from Defendant's misconduct.

142. Typicality. Plaintiff's claim is typical of those of other Class Members because Plaintiff's video content, like that of every other Class Member, was made available on YouTube and improperly altered and used by Defendant to train Defendant's generative AI models for commercial purposes. Plaintiff's claim is typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and no defenses are unique to Plaintiff. Plaintiff's claim and those of Class Members arise from the same operative facts and are based on the same legal theories.

143. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's interests coincide with, and are not antagonistic to, those of the Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation. Plaintiff's attorneys are committed to vigorously

prosecuting this action on behalf of the Class Members.

144. Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff's and Class Members' video content was unlawfully downloaded, altered and used by Defendant in the same way. The fact that Apple AI Video was a foundational model underscores that Defendant's conduct was uniform across the Class: every video unlawfully accessed from YouTube was ingested into the same core model that underpins Defendant's product ecosystem. This commonality further demonstrates the predominance of shared legal and factual issues among Class Members. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

145. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

146. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

147. Ascertainability. Finally, all members of the proposed Class are readily ascertainable. Defendant used datasets that contain the full lists of URLs and video identifiers for every YouTube video incorporated into the training pipeline. Those identifiers allow the parties to determine exactly which videos were used and to match each video to its creator through

YouTube's public channel and authorship information. Because the datasets provide a complete map of the videos Defendant downloaded, the identities of the affected creators are identifiable through straightforward reference to the URLs and corresponding channel data.

## CLAIM FOR RELIEF

### Violation of the DMCA (Anti-Circumvention) 17 U.S.C. § 1201(a)

148. Plaintiff repeats, realleges, and incorporates the allegations contained in the previous paragraphs as if fully set forth herein.

149. Plaintiff is an owner of valid copyrights in audiovisual works distributed through the YouTube platform. Plaintiff and Class Members own all rights, title, and interest in and to the claims asserted in this action, including all claims for violation of 17 U.S.C. § 1201.

150. YouTube employs TPMs that effectively control access to Plaintiff's and Class Members' copyrighted works within the meaning of 17 U.S.C. § 1201(a)(3)(B). YouTube's TPMs prohibit scraping, unauthorized downloading, bulk extraction, or other forms of data mining of audiovisual content.

151. These TPMs require the application of information, processes, and authorized interactions in order to access the audiovisual works in usable form. These measures function to prevent access to Plaintiff's works outside YouTube's authorized delivery environment. These restrictions prevent unlicensed access to the underlying video files, not simply reproduction of content.

152. When each of Plaintiff's and Class Members' works was published to YouTube, YouTube automatically applied TPMs that control access to and prevent unauthorized access to these audiovisual files.

153. Defendant knowingly and intentionally circumvented YouTube's TPMs by deploying automated systems designed to avoid, bypass, and impair those TPMs.

154. Defendant used automated tools for the sole purpose of circumventing YouTube's technological barriers that effectively control access to extracted files never made available to the public. Specifically, Defendant employed measures to access, extract, copy, and download Plaintiff's and Class Members' content from YouTube without authorization. In doing so,

Defendant improperly obtained millions of videos from YouTube's platform.

155. Defendant's conduct constitutes circumvention because it involved the avoidance and bypassing of technological measures that control access to copyrighted works, without the authority of Plaintiff or the Class Members (i.e., the copyright owners).

156. This distinction is critical: viewing a YouTube video through YouTube's authorized playback mechanisms does not provide access to the underlying file. Defendant's circumvention tools broke through that access barrier, triggering liability under § 1201.

157. As a direct and proximate result of Defendant's violations, Plaintiff has been injured and is entitled to all remedies available under 17 U.S.C. § 1203, including statutory damages, injunctive relief, and attorneys' fees.

158. Plaintiff and Class Members have been harmed by Defendant's conduct because Defendant has taken their content without authorization or compensation. Defendant's circumvention of YouTube's technological measures deprived Plaintiff and Class Members of their ability to control access to their works and of the compensation that any authorized form of access would have generated. Defendant accessed, downloaded, stored and utilized those videos to assemble training corpora for Defendant's AI models and services.

159. Each act of circumvention constitutes a separate violation of §1201. Plaintiff and the Class Members are entitled to statutory damages, injunctive relief, impoundment, and attorneys' fees and costs under 17 U.S.C. §1203.

160. Each of Defendant's acts of circumvention is a willful violation as Defendant specifically utilized automated tools designed to evade YouTube's TPMs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a judgment in his favor and against Defendant as follows:

a. Certification of this action as a class action and appointment of Plaintiff and Plaintiff's counsel to represent the Class;

b. Declare that Defendant has willfully circumvented the copyright protection systems of YouTube intended to protect Plaintiff's and the Class Members'

audiovisual content;

c. For statutory damages (up to the maximum allowed by law per violation), injunctive relief, and attorneys' fees and costs under 17 U.S.C. §1203;

d. For such equitable relief under 17 U.S.C. § 1203(b) as is necessary to prevent or restrain further violations of 17 U.S.C. § 1201(a) with respect to Plaintiff's and the Class Members' copyright-protected content, including a preliminary and permanent injunction prohibiting Defendant and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, from circumventing YouTube's technological protection measures, or from accessing, retrieving, or extracting Plaintiff's or the Class Members' works by means of such circumvention, including without limitation the content identified in Exhibits A, B, and C; and an order pursuant to 17 U.S.C. § 1203(b)(2) and (b)(6) providing for the impoundment and remedial destruction, on such terms as the Court deems reasonable, of all audiovisual files obtained through Defendant's circumvention, and all copies thereof, in Defendant's possession, custody, or control;

e. For an award of pre-judgment and post-judgment interest, to the fullest extent available, on any monetary award made part of the judgment against Defendant; and

f. For such other and further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

161. Plaintiff demands a trial by jury on all claims for which trial by jury is proper.

Dated: November 24, 2026

**SUSMAN GODFREY L.L.P.**

By: /s/ Rohit Nath

Rohit Nath (CA SBN 316062)
Michael Gervais (SBN CA 330731)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
rnath@susmangodfrey.com

mgervais@susmangodfrey.com
sfrazier@susmangodfrey.com

Max Lalon Tribble, Jr. (CA SBN 326851)
Justin Nelson (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Avenue, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
mtribble@susmangodfrey.com
jnelson@susmangodfrey.com

Amy Gregory (*pro hac vice*)
Morgan McCollum (*pro hac vice*)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
agregory@susmangodfrey.com
mmccollum@susmangodfrey.com

Rom Bar-Nissim (SBN 293356)
HEAH BAR-NISSIM LLP
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 432-2836
Rom@HeahBarNissim.com

Jarrett Lee Ellzey *(pro hac vice)*
Tom Kherkher *(pro hac vice)*
Leigh S. Montgomery *(pro hac vice forthcoming)*
ELLZEY KHERKHER SANFORD MONTGOMERY LLP
4200 Montrose Street, Suite 200
Houston, TX 77006
Telephone: (888) 350-3931
JEllzey@EKSM.com
TKherkher@EKSM.com
LMontgomery@EKSM.com

*Attorneys for Plaintiff and the Proposed Class*